

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

## NO. 02-10-00405-CR

ABEL NOE DOMINGUEZ                                              APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Shortly after moving out of the house he had lived in with Alma Garcia, Appellant Abel Noe Dominguez returned and stabbed her to death while she slept between their two young sons. Appellant now appeals his conviction for capital murder. We affirm.

----

[1]*See* Tex. R. App. P. 47.4.

## Factual and Procedural Background

Alma was the mother of four: two girls and two boys. J.J., a daughter from an earlier relationship, was eighteen; the other daughter, N.D., was fifteen. The boys, A. and N., were eight-year-old twins. J.J. was around eighteen months old when she and her mother moved in with Appellant and his parents. The other three children came later, after Alma, J.J., and Appellant had left his parents' home.

They moved into a house on Carnett Court in Fort Worth. Alma's older sister, Blanca, had signed a mortgage on the house so that Alma and her family could have a place of their own. Alma used the wages she and Appellant earned from their jobs to make the monthly mortgage payments. The few times Alma was unable to make the payments, Blanca made them for her. Approximately half of the thirty-year mortgage was paid off at the time of Alma's death in March 2009.

Appellant was a jealous man. Alma took care of her appearance, which made Appellant believe she was seeing another man. If she took too long at the grocery store, at the gym, or anywhere else, to him it meant that she must be having an affair. He warned her that she could not leave him until he decided he wanted her to. More than once, when Alma had problems with Appellant, Blanca reminded him that Blanca owned the house, and she advised him to leave Alma and the children there in peace.

On February 24, 2009, following an altercation, Appellant moved out, and Alma changed the lock on the front door.

The next week, J.J. and the twins were alone in the house when J.J. saw Appellant in the back yard with a ladder. J.J. stayed in the boys' room and heard Appellant try the back door and attempt entry through a dining room window. She phoned her mother.

Robert McWhorter lived in the house behind and one over from Alma's house, and they shared a portion of their backyard fences. Robert was in his backyard investigating what his dogs were barking at near the corner adjacent to Alma's yard when he saw Appellant near Alma's back door. Robert returned to his house, and looking out the kitchen window moments later, he saw Appellant, crouching on Alma's roof, apparently studying something.

Robert thought that was "real odd . . . very out of the ordinary" and it struck him "as something that was out of place." He walked around the corner to Carnett Court and stood in front of Alma's house. He saw nothing unusual there, so he returned to his own cul-de-sac and took a position between his house and a neighbor's for a better view.

Appellant was still on the roof. Again, Robert walked toward Alma's house, and this time Appellant passed him on the street coming from the other direction. They nodded at each other but did not speak; Appellant continued to his car—parked on Robert's cul-de-sac—climbed in, and drove away.

After J.J.'s phone call, Alma pulled into the cul-de-sac to look into her backyard. She spoke to Robert, and seemed "real upset."

The following Saturday night, March 7, 2009, the house on Carnett Court was empty. Alma and J.J. had gone to a friend's birthday party, the twins were across the street with a neighbor, and N.D. was at cheerleading practice. N.D. was the first to return home that evening; she retrieved her brothers and put them to bed in Alma's room, where they usually slept. Then she retired to the room she shared with her sister and turned on the television.

Around eleven o'clock, N.D. heard a noise on the roof, and her dog started barking at the window. When she looked out, she noticed that the ladder that usually lay on its side by the house was standing up against the roof. Nothing else appeared out of place, however, so after checking on her brothers, who had fallen asleep, she turned off her mother's television set and went to bed.

Alma and J.J. had stopped at Jack-in-the-Box on their way home and were eating in the girls' room when N.D. awoke briefly, saw that the time was three a.m., and fell back asleep. After Alma and J.J. finished eating, Alma went to her room and climbed into bed between the twins. J.J. put away the trash, said good night to her mother, and also went to bed.

N. woke to the bed shaking. He saw his dad on top of his mother, choking her. N. screamed, waking his brother. A. thought Appellant was punching Alma. The boys tried to shove Appellant off but could not budge him. Appellant got up,

4

though, and exited the front door. A. locked the door behind him, returned to bed, and he and his brother eventually drifted back to sleep.

A. was the first to awaken in the morning. He saw his mother lying on the side of the bed; she did not look okay. He thought N. was dead because there was blood on N.s' face and clothes, and he did not wake up easily. Eventually, N. woke up, and when he touched his mother—she felt frozen. The boys ran to their sisters' room.

J.J. did not believe them when they told her that they thought their mother was dead. But after looking in on her and finding her cold, J.J. called 911.

Officers arrived and taped off the driveway, yard, and part of the street. Inside the house, they found bloodstains on the front door. In the master bedroom, they discovered Alma's body partially on the bed. She had multiple wounds on her chest and neck. Some were not very deep, surface-type wounds. Others were penetrating, "incise wounds made by a very sharp object." Beneath her shoulder, the officers found a kitchen knife with blood on it—the blade slightly bowed, and the tip bent.

Outside, on the roof where earlier Robert had seen Appellant crouching, officers noticed that the wooden slats that normally would cover the gable had been removed, leaving a space large enough for a person to squeeze through into the attic. Inside the attic, a beam on the floor ran directly to a plywood panel that covered an opening into the boys' room, which had been converted from the garage some time before.

5

In the boys' room, the panel was in its place in the ceiling. But dust and bits of insulation matching the attic insulation were on the floor around a dresser that sat directly below the panel, close enough so that a person climbing out of the attic could use the dresser as a step. In the dust on top of the dresser, officers observed a "shoe transfer impression." And from the dust on the floor in front of the dresser, the officers lifted a partial right shoeprint.

While those officers were investigating the scene on Carnett Court, others were dispatched to a reported attempted suicide nearby. When the officers arrived, they found Appellant on a stretcher inside an ambulance, with his wrists cut. His wounds were serious, though not life-threatening, and he was transported to the hospital. Appellant asked an officer if his kids were okay and said that his wife had left him for another man.

Officers arrested Appellant for murder. Among his effects they seized were a pair of black K-Swiss tennis shoes and a key ring with seven keys. None of the keys on the key ring fit any of the locks at the house on Carnett Court. The general design, size, and tread pattern of Appellant's right tennis shoe, however, were indistinguishable from those of the print lifted from the floor of the boys' room.

The medical examiner ruled Alma's death a homicide, having determined that its cause was two wounds made with a sharp object that had transected the left common carotid artery and the vein next to it.

The State waived the death penalty, and Appellant was tried for capital murder. At the close of the State's evidence, Appellant moved for a directed verdict, which the trial court denied. The jury found Appellant guilty, and the trial court sentenced him to life.

**Issues One and Two: Denial of Appellant's Motion for Directed Verdict**

In his first two issues on appeal, Appellant challenges the trial court's denial of his motion for directed verdict. A challenge to a trial court's ruling on a motion for directed verdict is actually a challenge to the sufficiency of the evidence to support the conviction. *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 954 (1991); *Velasquez v. State*, 815 S.W.2d 842, 845 (Tex. App.—Corpus Christi 1991, no pet.). In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

***Issue One: "Stabbing" versus "Cutting"***

In his first issue, Appellant contends that the trial court erred by denying his motion for directed verdict because the indictment alleged that he killed Alma by "cutting" her, but the evidence showed that the fatal wounds were caused by "stabbing." In other words, Appellant would have us reverse his conviction for

7

capital murder and render a judgment of acquittal because he managed to stab Alma to death without cutting her.

Stabbing by definition involves cutting. *Merriam–Webster* defines "cut" as "to penetrate with or as if with an edged instrument." *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/cut (last visited Nov. 22, 2011). Further, it defines "stab" as "to wound or pierce by the thrust of a pointed weapon." *Id.*, http://www.merriam-webster.com/dictionary/stab (last visited Nov. 22, 2011).

Appellant concedes that Alma died from wounds: "The evidence was that the stabbing wounds were what were fatal." A "wound" is "an injury to the body (as from violence, accident, or surgery) that typically involves laceration or breaking of a membrane (as the skin) and usually damage to underlying tissues." *Id.*, http://www.merriam-webster.com/dictionary/wound (last visited Nov. 22, 2011). Thus, a wound, by definition, involves a cutting. So the English language does not support Appellant's contention.

Neither does the evidence. Dr. Gary Sisler, the medical examiner who performed the autopsy, testified that of the nineteen sharp force injuries that Alma sustained, wounds that he numbered eleven and twelve were fatal because they *transected* her carotid artery.

> Q. [by the State] In wounds number 11 and 12, the two fatal injuries, when you did your internal examination, did you discover whether the tracks of those two injuries actually injured some part of Ms. Garcia's — well, we would call it her throat, somewhere located

8

inside her neck where it appeared that something had potentially hit it?

A.   I found *transections* of the carotid artery, internal jugular artery, and the track ended in the trachea.

(Emphasis added).

"Transect" means "to cut transversely."   *Id*., http://www.merriam-webster.com/dictionary/transect (last visited Nov. 22, 2011)*.*  In other words, a transection is a cutting.

Finally, on cross-examination by Appellant, Dr. Sisler specifically testified that the fatal stab wounds *cut* Alma's trachea:

Q.   [By defense counsel] . . . [T]his particular knife, did it damage the trachea?

A.   It lacerated it, sir.

Q.   Lacerated, that means what?

A.   Made a cut in it.

Because neither the English language nor the evidence supports Appellant's contention, we overrule his first issue.

**Issue Two:  Home Ownership**

In his second issue, Appellant contends that the trial court erred by denying his motion for directed verdict because the evidence did not show that Alma had a greater right to possess the house that Appellant broke into than he did*.*  Since she did not have the greater right of possession, the argument goes,

he could not have committed burglary—the element that raised the offense to capital murder—because he could not burglarize his own home.

Under the penal code, a person commits burglary if, without the effective consent of the owner, the person enters a habitation and commits a felony, theft, or an assault. Tex. Penal Code Ann. § 30.02(a)(3) (West 2011). "Owner" is defined in the penal code in three different ways: a person is an owner if she has (1) "title to the property," (2) "possession of the property, whether lawful or not," or (3) "a greater right to possession of the property than the actor." *See id*. § 1.07 (a)(35)(A).

The jury charge tracked the penal code definitions of owner. Given the charge, therefore, the jury was authorized to find that Alma was the owner if she had title, lawful or unlawful possession, or a greater right to possession. Viewed in the light most favorable to the verdict, the evidence supports a reasonable juror's belief beyond a reasonable doubt that Alma was the owner because the evidence shows that she had a greater right to possession than Appellant *and* that at the time he entered the house without her effective consent, she had possession of the house, lawfully or otherwise.

The evidence showed that Alma had a greater right to possession than Appellant because Blanca testified that she signed the mortgage "for Alma" and reminded Appellant on numerous occasions that Blanca owned the house and that Appellant should leave Alma and the children there in peace. *See Mack v. State*, 928 S.W.2d 219, 223 (Tex. App.—Austin 1996, pet. ref'd) (holding that

10

because the appellant had moved out of the apartment he shared with a girlfriend, the girlfriend was the "owner" within the meaning of the burglary statute despite the fact that the appellant's name remained on the lease).

Moreover, whether or not the evidence showed that Alma had a greater right of possession, it showed that at the time of the offense she had possession of the house, lawfully or not, and that Appellant did not.[2]  "Possession" was correctly defined in the jury charge as actual care, custody, control, or management.  *See* Tex. Penal Code Ann. § 1.07(a)(39).  The evidence showed that Appellant moved out of the house more than a week before the murder, that Alma changed the locks, that Appellant did not have a key that fit, that he was seen skulking around the backyard and on the roof, that he tried to get in the house by coming in a window, and that he eventually did get in by climbing onto the roof, going through a gable, and then dropping down into the boys' room through the attic access.  Thus, viewed in the light most favorable to the verdict, a reasonable juror could have concluded that at the time Appellant broke into the

_____

[2]To the extent that Appellant also appears to argue that he acquired possession, lawful or not, under section 30.02 when he entered the house so he could not have committed burglary, we note that this view of the offense leads to the absurd result that a person who breaks into a home immediately takes possession of it and becomes the owner, who then gives himself effective and retroactive consent to break in and therefore cannot be found guilty of burglary. We are confident that this is not the result the legislature intended when it passed the burglary statute, and that to avoid this absurd result, possession must be determined immediately *prior to* and not *during* the break-in.  In other words, the legislature cannot have intended to allow one to acquire possession as against another already in possession, lawfully or not, by one's own unlawful entry.

11

house, Alma had actual care, custody, control, or management of it and therefore possession. Because it is reasonable to conclude from the evidence that Alma had possession of the house, and thus was the owner as defined by the penal code and in the jury charge, we hold that the trial court did not err by denying Appellant's motion for directed verdict on this issue. *See Little v. State*, 567 S.W.2d 502, 504 (Tex. Crim. App. 1978) (holding that ownership was adequately shown in man who testified that house belonged to his mother-in-law who was in a rest home and that he had "charge of it and power of attorney"); *Gregg v. State*, 881 S.W.2d 946, 951–52 (Tex. App.—Corpus Christi 1994, pet. ref'd) (holding that the fact that a woman's parents held title to the home did not preclude her from being considered the owner where testimony showed she lived in the house, provided for the family, and had control over what happened in the house); *Hudson v. State*, 799 S.W.2d 314, 315–16 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (holding that there was no evidence upon which the jury could find the defendant had a greater right of possession to woman's apartment where, although they once lived together, she later made him move out). Accordingly, we overrule Appellant's second issue.

**Issue Three: Appellant's Requested Jury Charge Instructions**

In his third issue, Appellant contends that the trial court erred by denying his requested jury charge instructions setting out specific provisions of the family code that govern spousal possessory rights in Texas.

12

These family code provisions were not law applicable to the case because ownership in a criminal prosecution for burglary is defined by the penal code, which takes precedence over civil statutes in criminal proceedings. Tex. Penal Code Ann. § 1.07 (a)(35)(A); *see* Tex. R. Evid. 101(c).[3] Accordingly, we overrule Appellant's third issue.

## Issue Four:  Deadly Weapon Finding

In his fourth and final issue, Appellant complains that the judgment erroneously reflects a deadly weapon finding when the issue of whether Appellant used a deadly weapon was never presented for the jury's determination.

The State responds by citing *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985) to support its position that the jury's verdict "necessarily *implied*" an affirmative deadly weapon finding. (Emphasis added.)  In *Polk*, the court of criminal appeals stated that "if the indictment by allegation specifically places the issue before the trier of fact (i.e. '….by stabbing him with a knife, a

---

[3]Entitled "Hierarchical Governance in Criminal Proceedings," rule 101(c) provides:

> Hierarchical governance shall be in the following order:  the Constitution of the United States, those federal statutes that control states under the supremacy clause, the Constitution of Texas, the Code of Criminal Procedure and the Penal Code, civil statutes, these rules [of evidence], and the common law.  Where possible, inconsistency is to be removed by reasonable construction.

Tex. R. Evid. 101(c).

13

deadly weapon....'), then an affirmative finding is de facto made when the defendant is found guilty 'as charged in the indictment.'"  693 S.W.2d 391, 394 (Tex. Crim. App. 1985); *see also Ruben v. State*, 645 S.W.2d 794, 798 (Tex. Crim. App. 1983) (holding that trial court erred by entering a deadly weapon finding when the jury found the appellant guilty "as alleged in the indictment" and the indictment contained no mention of a deadly weapon).

Here, the indictment contained the following "deadly weapon finding notice":

> AND IT IS FURTHER PRESENTED TO SAID COURT THAT A DEADLY WEAPON, TO-WIT: A KNIFE, THAT IN THE MANNER OF ITS USE OR INTENDED USE WAS CAPABLE OF CAUSING DEATH OR SERIOUS BODILY INJURY, WAS USED OR EXHIBITED DURING THE COMMISSION OF THE FELONY OFFENSE OR FELONY OFFENSES SET OUT ABOVE OR DURING THE IMMEDIATE FLIGHT FOLLOWING THE COMMISSION OF THE ABOVE FELONY OFFENSE OR FELONY OFFENSES AND THAT THE DEFENDANT USED OR EXHIBITED THE DEADLY WEAPON OR WAS A PARTY TO THE OFFENSE AND KNEW THAT A DEADLY WEAPON WOULD BE USED OR EXHIBITED.

But the prosecutor did not read the deadly weapon notice to the jury when he read the indictment at the start of trial, nor was the notice included in the jury charge.  After retiring to deliberate, the jury returned a general verdict finding Appellant "guilty of the offense of capital murder as alleged in the indictment."

Although this case is similar to *Polk* in some ways, at least four issues give us pause as we consider the reasoning urged by the State.  The first is that *Polk* does not stand for the proposition that deadly weapon findings may be implied—

14

to the contrary, it specifically sought to eliminate them. As stated by the majority in that case, "No longer will a verdict 'amount to' or 'necessarily imply' an affirmative finding of use or exhibition of a deadly weapon or firearm. We will no longer look to the facts of the case to permit an 'implied' affirmative finding . . . ." 693 S.W.2d at 396. Judge Clinton seconded the majority in his concurring and dissenting opinion, noting that the court's decision seeking to pull the bench and bar out of the "quagmire" of implied or inferred findings was overdue. *Id*. at 397 (Clinton, J., concurring and dissenting); *see also Lafluer v. State*, 106 S.W.3d 91, 92 (Tex. Crim. App. 2003) (reaffirming *Polk*'s holding "that there must be an *express* finding of a deadly weapon when the jury is the factfinder" (emphasis added)).

The second difficulty is that although *Polk* held that if the indictment "specifically places the issue before the trier of fact (i.e. '….by stabbing [the victim] with a knife, a deadly weapon….'), then an affirmative finding is de facto made when the defendant is found guilty 'as charged in the indictment,'" the prosecutor in this case did not read the State's deadly weapon notice in open court when reading the indictment, nor was the deadly weapon notice included in the court's charge on guilt-innocence. *See Polk*, 693 S.W.2d at 394. So it strains credulity to assert that "the indictment by allegation specifically place[d] the issue before the trier of fact." *See id.*

The third concern about the State's reasoning is that this is a capital case in which the punishment upon a guilty verdict is automatic: life without parole.

15

Tex. Penal Code Ann. § 12.31(a)(2) (West 2011). *Polk* and its progeny dealt with affirmative deadly weapon findings in noncapital felony cases where an improper finding potentially had a deleterious effect on when a convicted defendant would become eligible for parole. Thus, arguably *Polk* does not even apply to this case.

This last issue leads us to a fourth, which is the issue of harm. Although Appellant frames his issue as the trial court having erred by including a deadly weapon finding in the judgment, he complains that the trial court erred to do so because the charge lacked "a paragraph encompassing the deadly weapon finding notice" authorizing the jury to make such a finding. Thus we take his complaint as one of error in the charge. Because Appellant did not object to this absence of a paragraph encompassing the deadly weapon notice, assuming without deciding that the charge thus was erroneous, we must decide whether Appellant was egregiously harmed. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

Under the current state of the law, it appears that the only harm flowing from an unauthorized deadly weapon finding would be its effect on when a person convicted and sentenced to prison would become eligible for parole. But as we have noted, this is a capital case in which the State waived the death penalty, making Appellant's punishment upon a finding of guilty automatic life without parole. *See* Tex. Penal Code Ann. § 12.31(a)(2). Thus, it appears that although the judgment contains a deadly weapon finding entered by the trial court when the charge never placed the issue before the trier of fact—and that

16

the trial court therefore lacked authority to include a deadly weapon finding in the judgment—because the deadly weapon finding has no actual effect on Appellant's punishment, we cannot hold that he was egregiously harmed.

Accordingly, we overrule Appellant's fourth issue.

## Conclusion

Having overruled all four of Appellant's issues, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL, JJ.

PUBLISH

DELIVERED: December 1, 2011

17