COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|   |   |   |
|---|---|---|
| | § | |
| MANUEL CARRASCO-FLORES AKA | | No. 08-13-00231-CR |
| NELSON FLORES-CARRASCO, | § | |
| | | Appeal from |
| Appellant, | § | |
| | | 362nd District Court |
| v. | § | |
| | | of Denton County, Texas |
| THE STATE OF TEXAS, | § | |
| | | (TC # F-2012-2660-D) |
| Appellee. | § | |

## **O P I N I O N**

In this capital murder appeal, Appellant challenges the sufficiency of the evidence for the predicate criminal acts which elevate the crime from murder to capital murder. He also contends the trial court erred in failing to charge the jury with a self-defense instruction. For the reasons that follow, we affirm.[1]

### **FACTUAL SUMMARY**

Appellant was charged with capital murder for the death of Norma Gomez. The indictment charges that the murder occurred while Appellant was committing burglary of a habitation, or retaliation against the victim, either of which elevates murder to capital murder.

---

[1] This case was transferred from our sister court in Fort Worth pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedents of the Fort Worth Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

TEX.PEN.CODE ANN. § 19.03(a)(2)(West Supp. 2014).  The jury returned a guilty verdict on the capital murder charge and the trial court assessed the statutorily required life without parole sentence.  TEX.PEN.CODE ANN. § 12.31(a)(2)(West Supp. 2014).  In the same trial, which is the subject of a related appeal, Appellant was charged and convicted of causing serious bodily injury to Osman Matute-Gomez, Norma's son, by stabbing him with a knife.[2]

Appellant is described throughout the record as either Norma's boyfriend or common law husband.  He had been seeing her for about three years.  Three to four months before the murder, Appellant and Norma moved in together at the Basswood Manor Apartments.  Appellant contends the apartment was put under Norma's name because he could not read or write, but he paid the rent.  Appellant claimed he signed a lease, but the apartment's record show only Norma's signature on the lease and related disclosure documents.  Appellant was listed as an "occupant."

Norma's seventeen-year-old son, Osman, was also sharing the apartment.  He never liked Appellant and tried to get him to leave.  There was undisputed testimony that about a week prior to the murder, Osman told Appellant's brother that if he did not come for Appellant, Osman would kill Appellant.  Appellant recalled another instance where Osman told him to stay out of his life or else he was going to "knife" him.  Norma told Appellant about three days prior to the murder that Osman had once put a knife to Appellant's neck as he was sleeping, but Norma coaxed him out of following through.

The jury heard two differing accounts of the events on the morning of the murder.  The version most favorable to the verdict suggests that Norma awoke and sent Osman off to school.  She was in the kitchen making breakfast.  Appellant walked in and asked what she was making him for lunch and she told him to make his own lunch.  That started an argument leading to

[2] Because they share a common surname, we identify them throughout the opinion by their given names.

Appellant grabbing a kitchen knife and threatening her. She reached for her cell phone, but he grabbed it and told her she was not calling anybody. He then showed her some sort of image of a gun on the cell phone and threatened to kill her. He took the knife and stuck it into an air mattress that was on the floor of the living room. A downstairs neighbor heard the argument and what sounded like Appellant using the word "regret."

Norma then ran out of the apartment and across the street to where she knew police officers were routinely stationed for traffic enforcement. An officer called a regular patrol unit which took Norma's report of events. The responding officers found Norma crying, scared, and she appeared shaken. They noted she had bruises on her arm. The officers went into the apartment and found it empty. They found a knife on the kitchen counter, but did not see the air mattress.

By this time, Norma's boss and friend, Idalia Mata, arrived. While Norma and Mata were talking to the officers, Mata received a call on her cell phone from Norma's cell phone, which Appellant had apparently taken with him. An officer told Mata to put the call on speaker phone. She answered, and the caller identified himself as Appellant. He asked to speak to Norma. Norma told Appellant she did not want him back in the apartment. Appellant responded that Norma would have to leave. The two continued to argue, and when the officer took the phone and identified himself as a police officer, Appellant disconnected the call.

The officer called the number back several times and Appellant finally answered. The officer asked Appellant to return to the apartment so he could obtain his side of the story. Appellant declined saying he was working and was on his way out of town. Appellant would not say where he was, and the officer finally told him "not to come back to the apartment." The officer suggested that Norma leave the apartment and stay with friends or family. When she

refused, an officer went to the leasing office to check the lease and investigate changing the locks.

Appellant's version of these events was far different. He agreed they had a fight, but it stemmed from Norma's jealously over a young woman at the apartment complex who would try and talk to Appellant. He claimed that as he left for work, Norma said she was not going to allow him to be with another woman and would rather call the police and have him deported to Honduras. He acknowledged taking her phone. His brother, Jose Flores[3], picked him up about 7:20 am to drive him to work. When he heard his brother honk the horn from the parking lot, he left the apartment and knew nothing about Norma walking across the street to flag down an officer. Jose recalled seeing Norma and Appellant leave the apartment at the same time. He described her as crying and his brother was "sad." When Appellant entered Jose's car, Jose saw Norma walk across the street to talk to a policeman. Both brothers then exited Jose's vehicle and climbed into a co-worker's vehicle. They all then left for their jobsite. Appellant agreed that he later spoke with a person on the phone who identified himself as a police officer.

After the police left, Norma and Mata went to the leasing office to arrange for changing the locks. Norma asked that Appellant be removed from the lease and that her son be added. Norma paid the fee to accomplish the paperwork change and the locks were changed that morning She dropped the new key at her son's school and then went to work. She finished work at 5 p.m. and Mata dropped her off at the apartment.

During the course of the day, Appellant called Mata's phone and left several voice mail messages. In one, he asked her to tell Norma to give him back all of his things, or if she wanted to keep his belongings, she could pay him a $1,000. In another, he suggested their argument was over his drinking beer on Saturday and he asked Mata to tell Norma he loved her. He also said

---

[3] We likewise refer to Appellant's brother by his given name, Jose.

that "everyone is angry" that Norma called the police and "she should not have done that." In yet another, Appellant sounded as if he were crying and apologizing for the fight that morning.

Appellant also recalled talking with Norma about four times that day, but these conversations were more like arguments. In one, she told him to pick up his things. But according to Jose, Appellant related to his co-workers that Norma had agreed to give him another chance.

There are also several versions of the details of the murder. We begin with the evidence supporting of the jury's verdict. Part of the State's version comes from Osman's testimony. Osman arrived home from school about 4 p.m. and Norma got home from work about 6 p.m. Osman secured both the lock on door knob and the inside deadbolt. Later, he heard someone trying to use a key to get in and saw Appellant through the peephole. Appellant started knocking hard at the door and when that did not get a response, he kicked in the door. A crime scene photograph shows the door frame broken with the door locks still engaged.

Appellant was upset that they had not opened the door. He asked Norma why she had gone to the police. Norma told him to get his belongs. He asked for his television which Osman went to get. As Osman left, he heard a "thud" behind him and turned to see Appellant striking Norma and then throwing her to the floor. Appellant got a knife from the kitchen and stabbed Osman in the chest. He then stabbed Norma. Osman went to the bedroom to find something he could use as a weapon. He returned with a ceramic ornament and broke it on Appellant's head while Appellant was on top of Norma. He pulled Appellant off his mother. She fled the apartment first with Osman running after her. Norma collapsed near the bottom of the stairs and Osman was just barely out the door when he collapsed. Osman saw Appellant go down the stairs and then stab his mother several more times.

5

The State also relied on an independent eye-witness, Carlos Dominguez, who lived downstairs. He heard shouting and went outside to check on his own daughter. He then saw Norma stumble down the stairs. Appellant followed shortly thereafter with a knife in his hand and stabbed Norma several more times. Osman then came out of the apartment and fell, holding an apparent wound. Dominguez could not see any injuries on Appellant at that time. Appellant headed toward his brother who was waiting in a vehicle in the parking lot. Appellant and Jose then began fighting over the knife. Jose got the knife and threw it away, and the pair left in Jose's car. The knife was found sticking into the ground across from the parking lot.

Another part of the State's case came in through Jose, who recanted some of his statements to the police the night of the stabbing. Jose had dropped his brother off from work and was in the parking lot. Two minutes later, Appellant called him in tears, asking if he was still there. Three to four minutes later, Appellant emerged from the apartment. Jose had told a police officer that he saw his brother stabbing himself. He also reported that he tried to get the knife away from his brother. Appellant told him that he would rather die than go to jail. He also admitted that "he hurt or killed the woman, and that the devil told him to do it." At trial, however, Jose only recalled seeing a knife stuck in his brother's chest. He did not recall trying to stop his brother from killing himself. Instead, he pulled the knife out, threw it away, and then took Appellant to the hospital.

The jury also heard Appellant's version of events from a taped interview made at the hospital that night, from various hearsay statements made by Appellant at the hospital, and from Appellant's trial testimony. We summarize each separately.

Jose drove his brother from the apartment complex to the hospital. Appellant had a stab wound to the upper quadrant of the left chest and cut wounds on his right hand. He told Jose his

hand was cut when he got the knife away from Osman. While he was wrestling the knife away from Osman, Norma was "striking" Appellant and she had hit him over the head with a flower vase, causing bleeding and swelling.

While at the emergency room, a detective and officer interviewed Appellant. He was read his Miranda rights and agreed to talk to the officers. He told them that Osman had stabbed him in the hand and chest. At one point in the struggle, Norma got between the two and Osman stabbed her in the chest. He claimed Osman was a "crackhead" and "using rock." Appellant at one point used Norma as a shield to block Osman from stabbing him. When pressed to tell the truth, Appellant admitted that he actually stabbed Norma and killed her. At other times, however, he denied that anything happened to Norma. He also claimed that Norma stabbed him. The officer finally told Appellant that Norma was dead and Appellant became nearly hysterical, saying that the devil was in him and made him do it. He then terminated the interview. Another officer at the hospital recounted several statements from Appellant, all relayed to him by a Spanish-speaking nurse.[4] Appellant was repeating that he did not know, or could not believe, what he did, and saying he was sorry while also yelling "diablo." This same nurse related to the officer that Appellant had been locked out of his apartment and had kicked in the door. He began arguing with Norma and "Norma stabbed him in the chest while her son Osman hit him in the head." He grabbed the knife and "stabbed both Osman and Norma in self-defense."

Appellant's testimony at trial was somewhat different. He intended to get his possessions and rent a room for himself, though he hoped to talk with Norma. When he tried the key in the door, it would not work and he knocked. The door "was opened to me, I don't know who did [sic]." He later testified that Norma opened the door. Norma asked what he wanted, and he

---

[4] Appellant speaks only Spanish and several of the officers spoke only English.

7

asked for his clothes and a chance to use the bathroom. He then saw Osman with his hand behind his back holding a knife. There was a trash sack with his clothes and she told him to pick up his belongings quickly "because the officers were going to arrest me."

Appellant then claimed that Osman attacked him by swinging the blade and his mother intervened. Appellant was unsure if Osman cut his mother but he cut Appellant's hand as he tried to defend himself. Appellant also told the jury that "they" had locked the front door. During this exchange, Appellant claimed that Osman stabbed him in the chest but he could not remember what happened after that. He did not recall stabbing either Osman or Norma. While he did recall going towards his brother with the knife stuck in his chest, he thought this was just after Osman had stabbed him.[5] He also recalled Osman verbally threatening to kill him. He did not recall being hit over the head. He did not recall the drive to the hospital, or anything that was said at the hospital.

Norma suffered eleven stab wounds, including two with entry points in her back. She had what appeared to be defensive wound on her hands. The coroner determined that some the wounds were potentially lethal, but could not identify which one in particular lead to her death. The coroner could not determine the order in which the wounds were made, nor could she exclude possibility the wounds were made by more than one person. Norma died of exsanguination due to multiple stab wounds. Appellant had diagonal cuts across the inside of his index, middle, and ring finger of the right hand. These would have been consistent with injuries from his hand sliding down the knife from the handle onto blade as he stabbed with the knife.

---

[5] This sequencing is implausible in light of Dominguez's testimony that Appellant stabbed Norma several times at the bottom of the stairs while Osman was collapsed at the top of the stairs. Appellant testified at trial that Norma left the apartment first and he next, with the knife stuck in him. Unless there were two knives, of which there is no evidence, he could not have had the knife stuck in his chest at the same time used it to stab Norma several more times as he fled down the stairs.

8

Osman had a stab wound to the upper quadrant of his left chest and a laceration on his right bicep.

## ISSUES ON APPEAL

Appellant raises three issues on appeal. In Issue One, he contends that the State failed to present legally sufficient evidence for the two predicate acts necessary to elevate this murder to a capital murder. One predicate alleged by the State was burglary. Appellant contends that because he was still on the lease, and had no notice that he was being excluded from the apartment, he cannot be faulted for breaking into his own home. The second predicate act was retaliation. Appellant contends the evidence is insufficient to support a finding that he had any intent to retaliate against Norma for calling the police. In Issue Two, Appellant complains of the trial court's failure to grant his motion for directed verdict for the same reasons advanced under Issue One.

In his third issue, Appellant faults the trial court for failing to include an instruction on self-defense, contending that while the testimony may have been conflicting, there was testimony supporting the defense. We take these issues in turn, but first pause to outline our standard of review.

## STANDARD OF REVIEW

Appellant's sufficiency challenge requires us to consider all of the evidence in the light most favorable to the verdict, and the reasonable inferences that flow from it, to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App. 2010). We look at "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova*

9

*v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985). Each fact need not point directly and independently to the guilt of the defendant, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App. 1993)("[I]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). "If, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal." [Emphasis in original.] *Id*.

Appellate review of alleged jury charge error generally involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex.Crim.App. 2012); *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g). First, we must determine whether error occurred. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex.Crim.App. 2013); *Abdnor*, 871 S.W.2d at 732. When determining whether the charge is erroneous, we consider it "as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App. 1995). If there is error in the charge, we must then analyze whether sufficient harm resulted from the error to require reversal. *Wooten*, 400 S.W.3d at 606.

## SUFFICIENCY OF THE EVIDENCE

### Evidence To Support Burglary

A person commits burglary if, without the effective consent of the owner, the person enters a habitation and commits a felony, theft, or an assault. TEX.PEN.CODE ANN. § 30.02(a)(3)

10

(West 2011).[6] The Penal Code defines "Owner" in three different ways: a person is an owner if she has (1) "title to the property," (2) "possession of the property, whether lawful or not," or (3) "a greater right to possession of the property than the actor." *See* TEX.PEN.CODE ANN. § 1.07(a)(35)(A)(West Supp. 2014). Here, the jury's charge defined "Owner" as "a person who has title to the property, possession of the property, or a greater right to possession of the property than the person charged." (omitting the "whether lawful or not" language). "Possession" in turn is defined as "actual care, custody, control, or management" of the property. *Id.* § 1.07(a)(39).

Appellant claims that no one had a greater right to possession than he, and therefore he could not have committed burglary by breaking into his own apartment. He contends that the lease and Texas Property Code gave him the right to be in the apartment, and that neither Norma, the Basswood Manor Apartment staff, or a police officer had the unilateral authority to exclude him from the residence.

A person who had equal possessory rights to a property runs afoul of the burglary statute by entering that property after their entry rights are effectively revoked. In *Mack v. State,* 928 S.W.2d 219 (Tex.App.--Austin 1996, pet. ref'd), the defendant gained entry to his girlfriend's apartment where he once lived and killed his girlfriend's new male roommate. *Id.* at 221-22. He had moved out of the apartment about three months earlier and taken all of his possessions with him. *Id.* at 221. He had stopped paying rent, and agreed to not come over unless he called first. *Id.* On trial for capital murder, he challenged the underlying burglary charge claiming that because his name was on the lease, he had a right to enter the premises. *Id.* at 222. The court rejected the argument because he had "voluntarily abandoned those rights on the date of the

---

[6] One also commits burglary by entering a premises without the consent of the owner with the intent to commit a felony or theft. TEX.PEN.CODE ANN. § 30.02(a)(West 2011).

11

offense and had far less right, *at that time,* to control of the apartment." [Emphasis in original.] *Id*. at 223. "The touchstone of our analysis is not whether the defendant has any right to possession of the property at all, but whether the alleged owner's right to possess the property is greater than the defendant's." *Id*.

The issue also arose in *Dominguez v. State*, 355 S.W.3d 918 (Tex.App.--Fort Worth 2011, pet. ref'd)(mem. op.), another capital murder case. The defendant there had lived in a house he shared with his girlfriend until about two weeks before the murder. *Id*. at 919. Title to the house was held by the girlfriend's sister, but it was acquired for the benefit of the girlfriend and her children. *Id*. After the defendant moved out, the locks were changed. *Id*. The defendant then broke into the house through the attic and killed his girlfriend. *Id*. at 920. He challenged whether he could commit burglary of a house that the deceased did not technically own, and for which he had made many of the mortgage payments. *Id*. at 922.

The Fort Worth court disagreed for two reasons. *Id*. at 922. First, the girlfriend had a greater right of possession than did the defendant. *Id*. The title owner of the house testified the house was acquired for girlfriend's benefit, and not the defendant. *Id*. Second, the court focused on the statutory definition of "owner" which includes one in possession, whether lawfully or not. *Id*. At the time of the break-in and murder, the girlfriend had possession of the house and the defendant did not. *Id*. at 923. Significant to the court was the fact the defendant broke into the house because the locks had been changed. *Id*. *See also Hudson v. State,* 799 S.W.2d 314, 315-16 (Tex.App.--Houston [14th Dist.] 1990, pet. ref'd)(defendant lost right of possession to woman's apartment where, although they once lived together, she later made him move out); *Gregg v. State,* 881 S.W.2d 946, 952 (Tex.App.--Corpus Christi 1994, pet. ref'd) ("[T]he evidence is sufficient for a rational trier of fact to have found beyond a reasonable doubt that

appellant, who had not been a member of his wife's household for seven months, was not welcome there and was not permitted to just enter in at will.")

Another line of cases has focused on protective orders or other decrees which exclude one from property that they otherwise would have a right to possess. In *Ex parte Davis*, 542 S.W.2d 192 (Tex.Crim.App. 1976), Cullen Davis, his brother, and a trust, had record ownership of a house. *Id*. at 195. His estranged wife, however, had been given exclusive possession of the residence through a trial court's temporary order in a divorce proceeding, and Cullen Davis was ordered to stay away from the property. *Id*. Based on the divorce court order, the Court of Criminal Appeals rejected his claim that he could not have committed burglary of property he jointly owned. *Id*. at 196; *see also Robertson v. State*, 21 S.W.3d 554, 558 (Tex.App.--Waco 2000, pet. ref'd)(defendant excluded by court issued protective order).

Appellant urges these cases support his position because unlike *Davis* or *Robertson*, no one obtained and served a protective order excluding Appellant from the premises. Nor was definitive notice of the attempted lease change or exclusion ever given to him before he kicked in the door. Nonetheless, we reject Appellant's contention because the terms of the lease, and the circumstances of Appellant's exclusion, gave Norma a superior right of possession to the apartment at the time of the murder.

The original lease, dated May 3, 2012, was signed by only Basswood Manor and Norma. The first paragraph defines the parties as "owner" and "residents." Norma is the only listed resident. In a subsequent paragraph, the lease provides a space for "occupants" and Appellant was originally listed as an occupant. But the lease itself does not accord any particular rights to those listed as occupants. Rather it is merely a notice to the complex about who might be living

13

in the unit. Under the lease, occupants are not contractually bound to pay rent, although the resident may be responsible for their conduct and must see that they follow the complex's rules.

The apartment manager testified that only the resident has the right to make changes in the lease, or change the locks. An occupant does not have the right to make changes in the lease. The named resident can remove an occupant's name from the lease without notice or consent of the occupant. The lease itself does not address this issue, but the apartment manager's testimony would be proper to address what what may be an ambiguity in the lease. *See Fort Worth Neuropsychiatric Hospital, Inc. v. Bee Jay Corp.*, 600 S.W.2d 763 (Tex. 1980)(parol evidence appropriate to resolve latent ambiguity in lease agreement).

Norma attempted to make the occupant re-designation on the day she was murdered. The apartment manager made the change in the computer system, but not on the revised lease dated August 30, 2012. She left Appellant's name on the document, and added Osman.[7] Regardless of whether the change in the lease was completed, Norma had the locks changed for the purpose of excluding Appellant. Her request to do so was honored by the apartment owner. A jury could have reasonably found her position on the lease as the "resident" and Appellant's position only as the "occupant," to be evidence of her greater right to possession. This seems particularly true given her authority to unilaterally change who can be an "occupant" and her ability to change the locks, which necessarily dictate access to the apartment.

Nor does the Texas Property Code aide Appellant's argument. The Property Code defines a "tenant" as one "who is authorized by a lease to occupy a dwelling to the exclusion of others . . . . " TEX.PROP.CODE ANN. § 92.001(6)(West 2014). Given his designation as an "occupant" under the written lease, Appellant could be deemed a "tenant" for the purposes of the

---

[7] The apartment manager also testified that there was another copy of the August 30, 2012 lease given to Norma that omitted Appellant as an occupant, but the staff failed to file a copy of this lease in their file and none was ever introduced at trial.

Property Code. The Code prevents a landlord from intentionally preventing "a tenant from entering the leased premises except by judicial process" other than for several exceptional circumstances not germane here. TEX.PROP.CODE ANN. § 92.0081(b). But a tenant's remedy if wrongfully locked out is to pursue "a writ of reentry" through a justice court. TEX.PROP.CODE ANN. § 92.009. The Code does not authorize any self help remedy, such as kicking down a locked and bolted door. *Id.*; *see Lighthouse Church of Cloverleaf v. Texas Bank*, 889 S.W.2d 595, 603 (Tex.App.--Houston [14th Dist.] 1994, no writ)(holding no right of self-help repossession of foreclosed property under the Code).

Appellant's argument also ignores the second category of ownership: possession of the property. TEX.PEN.CODE ANN. § 1.07(a)(35)(A). Norma and Osman had possession of the apartment when Appellant arrived that evening. The fact that his key no longer worked, and that Norma and Osman were not responding to his knocking, denied him possession. *Dominguez*, 355 S.W.3d at 923 (ex-girlfriend had possession of house at the time defendant broke in through the attic after locks changed). Appellant's remedy at the time was to contact the apartment's management, contact the police, or seek a writ of re-entry from a justice court. TEX.PROP.CODE ANN. § 92.009.

### Evidence To Support Retaliation

The State's second predicate for the capital murder was Obstruction or Retaliation under TEX.PEN.CODE ANN. § 36.06 (West 2011). In relevant part, that statute provides:

(a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of the service or status of another as a:

.    .    .

(B) person who has reported or who the actor knows intends to report the occurrence of a crime; . . . .

15

There is no question that Appellant harmed Norma, or even that she accused Appellant of committing a crime on the morning of her murder. The issue is whether there is constitutionally sufficient evidence that Appellant harmed Norma "in retaliation or on account of" her reporting a crime. *Id*. at § 36.06(a)(1). The State carries the burden of establishing Appellant's motive under the retaliation statute. *Raybon v. State,* No. 02-12-00071-CR, 2013 WL 4129126 at *4 (Tex.App.--Fort Worth Aug. 15, 2013, pet. dism'd)(mem. op., not designated for publication); *Wheeler v. State*, 975 S.W.2d 793, 795 (Tex.App.--Beaumont 1998, no pet.); *Matter of M.M.R.*, 932 S.W.2d 112, 115 (Tex.App.--El Paso 1996, no writ). Motive may be inferred from "circumstantial evidence, such as the defendant's acts, words, or conduct." *Raybon*, 2013 WL 4129126 at *3.

Appellant's argues that there were several possible motives for the final altercation, only one of which could have been retaliation. He was upset that he was put out of the apartment, that the locks had been changed, that no one opened the door, that the couple's relationship was ending, and that he was compelled by the devil to kill Norma. He contends that the State failed to prove beyond a reasonable doubt that Norma's calling the police and reporting the crime was the motive which led to the murder.

Perhaps because motive is rarely an element of a criminal offense in Texas, we find little recent authority, and the parties cite to none, on how to evaluate a mixed motive case. At one time the Court of Criminal Appeals held that the existence of other possible motives does not absolve the defendant, so long as the culpable motive is proven. *Jones v. State*, 50 Tex.Crim. 194, 198-99, 95 S.W. 1044, 1046 (1906), *citing* 1 Wharton's Criminal Law, § 192 [ed. unknown]("No matter what other intents existed, if the intent to do the particular unlawful act is either proved or implied, the offense if committed is complete. If the law were otherwise there

16

would be few convictions of crime, for there are few crimes in which extraneous motives are not mixed up with the particular evil intent."); *see also*, *Weir v. State*, No. 12-06-00408-CR, 2008 WL 2358219 *6 (Tex.App.--Tyler, June 11, 2008, pet. ref'd)(mem. op., not designated for publication)(while there were several possible motives for murder, evidence of motive for hire was sufficient to sustain jury's finding). This view is in accord with federal criminal law under 42 U.S.C. § 3631 which criminalizes force, threats of force, intimidation, or injury to someone in federal housing matters "because of" race, color, religion, sex, handicap, and other enumerated classifications. Cases applying that statute have recognized the "presence of other motives . . . does not make [a defendant's] conduct any less a violation of 42 U.S.C. § 3631." *United States v. Johns,* 615 F.2d 672, 676 (5th Cir. 1980); *see also Piekarsky v. Donchak*, 687 F.3d 134, 141 (3rd Cir. 2012)(rejecting proposed jury instruction that race and residency had to be the sole or primary motivation behind the assault); *United States v. Craft,* 484 F.3d 922, 926 (7th Cir. 2007)(government was not required to prove that racial animus was the defendant's "sole motivation" but only that the victims' race or ethnicity partially motivated the crimes).

While we agree that the jury had before it many possible motives, the State developed sufficient evidence that Norma's report to the police would have been sufficiently important to Appellant to account for the crime. Appellant admitted that Norma told him that she would call the police and have him deported. After Appellant threatened her with a knife, Norma reached for her phone but Appellant snatched it away. He told her she was not calling anybody. By taking the phone, he hindered her ability to contact the authorities, which would infer the importance of the issue to him.

Appellant denied being aware that Norma walked across the street to report the incident to the police. But Appellant's brother sitting in the same vehicle saw her make a report to a

17

police officer. Appellant hesitated, and then the two left to get in another vehicle. A jury could infer that Appellant knew about the report, and it was sufficiently important to him to deny that knowledge on the witness stand. Later that same morning, Appellant conceded he talked to a policeman, and told Norma that "everyone is angry" she had called the police and "she should not have done that."

That night, after breaking into the apartment, he asked Norma why she had gone to the police. She told him to pick up his belongings quickly because the police were out to arrest him. Appellant then stabbed both Norma and Osman. We find sufficient evidence supporting the jury's view that Appellant harmed Norma on account of her reporting the knife incident that morning. We overrule Issue One.

### Motion for Directed Verdict

In Issue Two, Appellant complains the trial court erred in denying his motion for directed verdict because there is insufficient evidence to establish that Appellant committed the underlying burglary or retaliation offenses. His arguments are identical to those raised under Issue One. A challenge to a trial court's ruling on a motion for directed verdict is actually a challenge to the sufficiency of the evidence to support his conviction. *Madden v. State,* 799 S.W.2d 683, 686 (Tex.Crim.App. 1990); *Dominguez,* 355 S.W.3d at 918. Because the standard of review and the arguments are the same, we overrule Issue Two.

### CHARGE ERROR

In Appellant's third issue, he complains of the trial court's refusal to include an instruction on self-defense. A trial judge must give a requested instruction on every defensive issue raised by the evidence without regard to its source, its strength, or whether it is contradicted or credible. *Juarez v. State*, 308 S.W.3d 398, 404-05 (Tex.Crim.App. 2010)(defendant's conflicting statements did not negate duty of the trial judge to submit defense); *Shaw v. State,*

243 S.W.3d 647, 657-58 (Tex.Crim.App. 2007). The defendant's only burden is to present that minimum quantity of evidence sufficient to support a rational jury finding each element of the defense. *Shaw*, 243 S.W.3d at 658 ("a defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true."); *Granger v. State*, 3 S.W.3d 36, 38 (Tex.Crim.App. 1999). This rule preserves the jury's role as the arbiter of the credibility of the witnesses. *Miller v. State*, 815 S.W.2d 582, 585 (Tex.Crim.App. 1991)(op. on reh'g).

Self-defense is statutorily defined. TEX.PEN.CODE ANN. § 9.31 (West 2011) provides that a "person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*.[8] The defense can turn on the defendant's conduct. For instance, one cannot claim self-defense if he has provoked another's use or attempted use of unlawful force unless "the actor abandons the encounter, or clearly communicates to the other his intent to do so" and "the other nevertheless continues or attempts to use unlawful force against the actor." *Id*. at § 9.31(4)(A)(B). When the defense applies, a person is justified in using deadly force "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id*. at § 9.32(a)(2)(A).

Self-defense is also one of the confession and avoidance defenses. *Shaw*, 243 S.W.3d at 657-58. Under such a defense, one must admit to the underlying criminal act, the culpable mental state, and then raise the defense as justification for their conduct. *Id.* at 658; *Ex parte Nailor*, 149 S.W.3d 125, 133 (Tex.Crim.App. 2004)(defendant who contended at trial that victim

---

[8] Under certain circumstances, not applicable here, an actor's belief that force was necessary is presumed. *Id*. at § 9.31(a)(1)-(3).

was injury by accident had not confessed to elements of offense and could not raise self-defense).

After the State rested, the trial judge expressed skepticism about the self-defense theory because even if Appellant was justified in his actions in the apartment, it would not justify stabbing Norma as she lay outside the apartment on the stairs. After Appellant testified, the trial judge denied a self-defense charge because Appellant had not admitted to the offense. We perceive no abuse of discretion.

Appellant's trial testimony did not establish any of the elements of self-defense with respect to Norma. He did not recall her doing anything to him, and he could not recall doing anything to her. The only remaining evidence in the record is what Appellant told various people at the hospital on the night of the incident. Most of those statements relate to Osman threatening him with a knife. Only a few of the statements pertain to Norma and they are varied: Norma stabbed him; she hit him over the head with a porcelain figurine; his actions were done in self-defense. But he also testified that she did nothing to him and he did nothing to her.

None of this evidence establishes a *prima facia* claim of self-defense. Simply stating that Norma hit or stabbed him, without more, does not meet all the elements of the defense. For instance, did she hit or stab him *before* or *after* he stabbed her? Did he have an avenue for retreat? Were her action provoked or unprovoked? Was the use of deadly force immediately necessary, or was there some other action he could take? None of these basic issues are addressed by his sparse hearsay statements at the hospital. At most, we know that in one version of events that Norma did "something" to Appellant, but without any details of the context, he has not met his initial burden of showing the application of the defense. *See Ford v. State*, 112 S.W.3d 788, 793-94 (Tex.App.--Houston [14th Dist.] 2003, no pet.)(defendant not entitled to

20

necessity and self-defense claim when he failed to admit evidence for each element of the defenses).

Officer Wolk testified that a nurse claimed that Appellant had said that he acted in "self-defense." Setting aside the multiple layers of hearsay for which no objection was apparently lodged, or that the nurse was translating from Spanish to English for the benefit of the officer, we disagree that this single legal conclusion by Appellant states any facts from which a jury could reasonably acquit under a self-defense theory. Legal conclusions are generally not admissible, in part because they are not helpful to the trier of fact. *See Fairow v. State*, 943 S.W.2d 895, 900 (Tex.Crim.App. 1997)(lay opinion on culpable mental state might be excluded for any number of reasons, including witness not applying correct technical definition of term); *Lum v. State*, 903 S.W.2d 365, 370 (Tex.App.--Texarkana 1995, pet. ref'd)(witness's testimony regarding whether the defendant behaved "negligently" was properly excluded as not helpful and not shown to be based on proper legal definition); *Gross v. State*, 730 S.W.2d 104, 106 (Tex.App.--Texarkana 1987, no pet.)(collecting cases). Nor is the legal conclusion something which binds the trial court simply because it finds its way into the record. *See Thomas v. State*, 572 S.W.2d 507, 510 (Tex.Crim.App. 1976)(Douglas, J., dissenting)(courts not bound by legal conclusions when the underlying facts do not support the claim).

In the related appeal involving Osman's stabbing, we have reversed the conviction for failure to instruct the jury on self-defense. We distinguish between Norma and her son based on the record before us. As to Osman, there was evidence that Osman had previously threatened Appellant with a knife on at least two separate occasions, and Appellant was aware of these threats. On the night of the murder, Appellant testified that as he entered the room, he saw Osman with a knife behind his back. He testified that Osman then attacked him first without any

21

provocation, that he wrestled the knife away from Osman, and in the struggle, stabbed him. We simply find no similar development of facts to explain why Appellant would have stabbed Norma in her apartment, and much less as she lay incapacitated on the staircase. We overrule Issue Three and affirm the judgment of the trial court.

May 14, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)