ACCEPTED
06-15-00012-CR_06-15-00017-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/21/2015 1:43:03 PM
DEBBIE AUTREY
CLERK

<u>ORAL ARGUMENT NOT REQUESTED</u>

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/21/2015 1:43:03 PM
DEBBIE AUTREY
Clerk

**No. 06-15-00012-CR through 06-15-00017-CR**

**IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS**

---

## GARY CHRISTOPHER MORROW,
**Appellant**

**v.**

## THE STATE OF TEXAS,
**Appellee**

---

**On Appeal in Cause Nos.
CR-13-24716 through CR-13-24720 and CR-13-24922
From the 336TH Judicial District Court
of Fannin County, Texas**

---

# STATE'S BRIEF

---

**John B. Setterberg
State Bar No. 24043915
Assistant Criminal District Attorney
Fannin County, Texas
101 E. Sam Rayburn Dr., Ste. 301
Bonham, Texas 75418
903-583-7448
903-583-7682 (fax)**

**ATTORNEY FOR THE STATE**

## IDENTITY OF PARTIES AND COUNSEL

The State certifies that the following is a complete list of the parties, attorneys, and other persons with interest in the outcome of this case:

(1)   John B. Setterberg, Assistant Criminal District Attorney, Fannin County, 101 East Sam Rayburn Drive, Suite 301, Bonham, Texas 75418; ATTORNEY FOR THE STATE OF TEXAS.

(2)   Micah Belden, 711 N. Travis, Sherman, Texas 75090; APPELLATE ATTORNEY FOR APPELLANT.

(3)   Joey Fritts, 213 N. Crockett St., Sherman, Texas 75090, TRIAL ATTORNEY FOR APPELLANT;

(4)   Gary Christopher Morrow, TDCJ # 01981220, Goree Unit, 7405 Highway 75 South; Huntsville, TX 77344; APPELLANT.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ................................................................................... ii

INDEX OF AUTHORITIES .............................................................................. iv

STATEMENT OF FACTS ..................................................................................2

SUMMARY OF THE ARGUMENT ....................................................................6

ARGUMENT ....................................................................................................8

**1. Counsel's decisions regarding Appellant's mental health history were not objectively unreasonable, and any additional investigation would not have led to mitigating evidence or a viable insanity defense. ........8**

    a.    Appellant gave trial counsel no reason to investigate. ...........................11

    b.    Appellant appeared perfectly competent and his actions indicated that he knew what he did was wrong. ............................................................15

    c.    Counsel's decision not to use Appellant's mental health as a defense or an attempt at mitigation was valid trial strategy.........................................18

    d.    Even if counsel should have investigated further, the record evidence is not mitigating and does not support a claim of incompetence or insanity. .22

**2. A trial court is not required to inquire into competency when there is no evidence that a defendant is incompetent.................................................29**

**3. Gina Morrow and Donny Mangum made statements admissible as excited utterances soon after being violently assaulted, threatened, and raped by Appellant at gunpoint..........................................................................33**

**4. Hearsay, hearsay everywhere, none of it improper. ................................38**

    a.    Appellant did not object to testimony about his adulterous conversations with another woman, and even if he had, it was still

admissible.............................................................................................39

b.     Some things simply aren't hearsay. ..........................................41

c.     One has to object to hearsay in order to preserve error. .........................42

**5.  The evidence is sufficient to show that Appellant did not possess, and did not have a greater right to possess the house that he burglarized.........................................................................43**

CONCLUSION ...........................................................................................46

PRAYER ...................................................................................................48

CERTIFICATE OF COMPLIANCE.................................................................49

CERTIFICATE OF SERVICE .......................................................................49

# INDEX OF AUTHORITIES

## Cases

*Acosta v. State*, 2015 Tex. App. LEXIS 10463 (Tex. App. – Ft. Worth 2015).......40

*Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005) ...................................34

*Davis v. State*, 203 S.W.3d 845 (Tex. Crim. App. 2006) .......................................38

*Dominguez v. State*, 355 S.W.3d 918 (Tex. App. – Ft. Worth 2011).......................43

*Druery v. State*, 412 S.W.3d 523 (Tex. Crim. App. 2013)......................................30

*Everitt v. State*, 407 S.W.3d 259 (Tex. Crim. App. 2013).......................................40

*Ex parte Ewing*, 570 S.W.2d 941 (Tex. Crim. App. 1978) .....................................10

*Ex Parte Imoudu*, 284 S.W.3d 866 (Tex. Crim. App. 2009) ..................................23

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) .......................... 10, 18

*Ex parte Martinez*, 330 S.W.3d 891 (Tex. Crim. App. 2011) ...................................9

*Goodman v. State*, 66 S.W.3d 283 (Tex. Crim. App. 2000)....................................46

*Govea v. State*, 2013 Tex. App. LEXIS 15136 (Tex. App. – San Antonio 2013)...30

*Green v. State*, 1988 Tex. App. LEXIS 3086 (Tex. App. – Houston [1st Dist.] 1988) ................................................................................................................40

*Hill v. Lockhart*, 474 U.S. 52 (1985) ....................................................................23

*Jackson v. State*, 391 S.W.3d 139 (Tex. App. – Texarkana 2012).........................29

*Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) .....................................38

*Johnson v. State*, 967 S.W.2d 416 (Tex. Crim. App. 1998) ...................................38

*Mack v. State*, 928 S.W.2d 219 (Tex. App. – Austin 1996) ....................................43

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) ............................34

*Rivera-Reyes v. State*, 252 S.W.3d 781(Tex. App. – Houston [14th Dist.] 2008) ..38

*Rodriguez v. State*, 329 S.W.3d 74 (Tex. App. – Houston [14th Dist.] 2010) .........11

*Rodriguez v. State*, 74 S.W.3d 563 (Tex. App. – Amarillo 2002)............................14

*Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002)...........................................33

*Small v. State*, 466 S.W.2d 281 (Tex. Crim. App. 1971) ........................................22

*State v. Morales*, 253 S.W.3d 686 (Tex. Crim. App. 2008) ....................................18

*Strickland v. Washington*, 466 U.S. 668 (1984) ..................................... 9, 10, 18, 23

*Taylor v. State*, 2010 Tex. App. LEXIS 5591 (Tex. App. – Texarkana 2010)........18

*Turner v. State*, 422 S.W.3d 676 (Tex. Crim. App. 2013) ................... 29, 30, 32, 33

*Wackwitz v. Roy*, 418 S.E.2d 861 (Va. 1992) .........................................................20

*Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003).......................................34

**Statutes**

TEX. CODE CRIM. P. art. 46B.004 ...................................................................... 29, 30

TEX. CODE CRIM. PRO. Art. 46B.003 .....................................................................8

TEX. PENAL CODE § 1.07 ......................................................................................44

TEX. PENAL CODE § 22.08........................................................................................20

TEX. PENAL CODE § 30.02........................................................................................44

TEX. PENAL CODE § 8.01.........................................................................................9

**Other Authorities**

DANTE ALIGHIERI, DANTE'S INFERNO: THE VISION OF HELL FROM THE DIVINE
   COMEDY 82-87 (First Avenue Editions 2015) (1321) ...........................................20

Kristina Cowan, *Suicide and its Unrelenting Stigma*, THE HUFFINGTON POST,
   January 26, 2015 ....................................................................................................19

Lisa Esposito, *Suicide and Stigma: Moving Past Silence and Shame*, U.S. NEWS
   AND WORLD REPORT, September 9, 2015 .............................................................20

**Rules**

TEX. R. APP. P. 33.1 ....................................................................................................40

TEX. R. APP. P. 44.2(b) ...............................................................................................38

TEX. R. EVID. 801........................................................................................... 40, 41

TEX. R. EVID. 803........................................................................................... 33, 34

**IN THE SIXTH COURT OF APPEALS**
**TEXARKANA, TEXAS**

_____

## GARY CHRISTOPHER MORROW,
**Appellant**

**v.**

## THE STATE OF TEXAS,
**Appellee**

_____

TO THE HONORABLE JUSTICES OF THE SIXTH COURT OF APPEALS:

COMES NOW the State of Texas, by and through her assistant criminal district attorney, and respectfully submits this brief in the above-styled and numbered causes. This is an appeal from three convictions of aggravated assault with a deadly weapon, and one conviction each of burglary of a habitation, aggravated kidnapping, and aggravated sexual assault. On July 18, 2013, Appellant was indicted in seven cases, cause nos. CR-13-24716 through CR-13-24722 (Cl. R. at 13).[1] Beginning January 12, 2015, all seven cases were consolidated and tried together to a jury (Ct. R. at 10). On January 21, the jury found Appellant guilty on all but one of the aggravated sexual assault charges (Ct. R. vol. 8, at 14-17). On January 23, the jury sentenced Appellant to 20 years

_____

[1] There are six convictions and thus six clerk's records submitted in this appeal. For brevity and convenience, references to the clerk's record will be to that in cause no. CR-13-24716 unless otherwise noted.

incarceration in each of the aggravated assault cases and the burglary case, to 30 years in the aggravated kidnapping charge, and to 40 years in the remaining aggravated sexual assault charge (Ct. R. vol. 10, at 187-189). Additionally, the jury imposed fines in the amount of $10,000 in each case (Ct. R. vol. 10, at 187-189). Appellant filed notice of appeal on February 11, 2015 (Cl. R. at 218).

## STATEMENT OF FACTS

In the early morning hours of May 5, 2013, Appellant drove from his mother's house in McKinney, Texas, to his marital home near Ivanhoe, in Fannin County, Texas (State's Ex. 146). Appellant no longer lived at the Ivanhoe residence; he and his wife, Gina, were separated and had agreed that she would maintain the residence until the divorce could be finalized (Ct. R. vol. 3, at 56-57). Appellant's stated purpose was to reconcile with his wife. However, his actual purpose was much more sinister.

Appellant showed up in Ivanhoe dressed in head-to-toe camouflage and a black "doo rag" (Ct. R. vol. 3, at 244). He carried with him a black hunting knife and a .40 cal. automatic handgun (Ct. R. vol. 3, at 244; State's Ex. 115A, 140). He gained entry to the house by breaking a window in the garage, then walked to the master bedroom to confront his wife, whom Appellant suspected had taken a new boyfriend (Ct. R. vol. 3, at 117, 161-62; State's Ex. 75-83). There he found her asleep with another man, Donny Mangum (Ct. R. vol. 3, at 69).

2

Appellant was enraged. He flipped on the light and began shouting at Gina, demanding to know what she was doing, who Donny was, and other particulars of her new relationship (Ct. R. vol. 3, at 68-69, 72-73). He held both Gina and Donny at gunpoint for several minutes, and several times threatened to kill them both (Ct. R. vol. 3, at 70). He degraded, physically assaulted, and humiliated Donny by demanding that Donny drop his pants and show Appellant his penis (Ct. R. vol. 3, at 81-82). After a time, Gina's adult daughter, Marissa, woke up and Appellant had her come into the room as well (Ct. R. vol. 3, at 83). He held all three of them at gunpoint, threatened to kill them all, and further threatened to "smoke the whole house," including the four young children that were sleeping in the living room (Ct. R. vol. 3, at 70-71, 87).

Concerned about Appellant's threatening behavior, Gina suggested that everyone go outside (Ct. R. vol. 3, at 87). Appellant agreed, and followed the three of them through the hallway toward the front door of the residence (Ct. R. vol. 3, at 88). Along the way, Marissa asked to get her cigarettes, and Appellant followed her as she ducked into the living room to retrieve them (Ct. R. vol. 3, at 92). Donny took advantage of Appellant's momentary distraction and ran out the front door, shirtless and shoeless, into the night (Ct. R. vol. 3, at 92-93). Appellant, furious over Donny's escape, again threatened to kill Gina and Marissa, and pointed the gun at Gina's head from point-blank range (Ct. R. vol. 3, at 96-99). Only when

3

Marissa stepped in between them and begged Appellant not to hurt Gina did Appellant relent (Ct. R. vol. 3, at 99).

Appellant kept the two women on the porch of the residence for several minutes, all the while apologizing and trying to convince Gina not to leave him (Ct. R. vol. 3, at 100-101). After a time, he suggested to Gina that he wanted her to perform oral sex on him (Ct. R. vol. 3, at 102). Gina immediately refused, but Appellant was insistent (Ct. R. vol. 3, at 102). He ordered her off the porch and into her truck in the nearby driveway, where he joined her (Ct. R. vol. 3, at 104-05). He put the gun down on the floorboard of the vehicle, unzipped his pants, and repeated his demands that Gina perform oral sex (Ct. R. vol. 3, at 106). Fearing for her life and the life of her daughter, Gina complied (Ct. R. vol. 3, at 106). Appellant then grew bolder, and ordered Gina to remove her own pants and lie back on the front seat (Ct. R. vol. 3, at 109). Again, Gina complied – albeit unwillingly – and Appellant penetrated her vagina with his penis, all the while telling her that he was going to kill her and her family (Ct. R. vol. 3, at 110).

Soon thereafter, Appellant saw flashing police lights coming toward the house (Ct. R. vol. 3, at 110). Donny had made it to a neighbor's house, and the neighbors had called the police (Ct. R. vol. 3, at 251). Upon seeing the lights, Appellant stopped having intercourse with Gina, told her that Donny had called the police and that he would kill them all, and got out of the truck (Ct. R. vol. 3, at

4

110-11). He held Gina at gunpoint, again from point-blank range, until Gina begged him to spare her life (Ct. R. vol. 3, at 111-12). Reluctantly, Appellant agreed and, after telling Gina he loved her, he disappeared into the night (Ct. R. vol. 3, at 122).

Gina gathered Marissa and the young children in the living room and had them wait in the locked laundry room (Ct. R. vol. 3, at 114). She ensured that all doors and windows were locked and waited for the police to arrive (Ct. R. vol. 3, at 115-16). Soon thereafter, however, Appellant began calling Gina's cell phone (Ct. R. vol. 3, at 119). He told her not to cooperate with police, that they could work out their marital differences, and that he "forgave her" for what she had done to him (Ct. R. vol. 3, at 120-21). On the instructions of law enforcement, Gina continued speaking with Appellant while they attempted to locate him via his cell phone signal (Ct. R. vol. 3, at 124).

They tracked him to the area of Howe, Texas, in neighboring Grayson County (Ct. R. vol. 4, at 172). Appellant had fled to the apartment of Marsha Skinner, a former girlfriend in Howe, and he told her needed to stay there for a little while (Ct. R. vol. 4, at 280). Appellant appeared agitated and wouldn't disclose why he was there, unannounced, so early in the morning (Ct. R. vol. 4, at 280, 285). He would only say that he had caught his wife in bed with another man, and that he didn't want to talk about it (Ct. R. vol. 4, at 280). Local police were

5

able to locate Appellant's vehicle and took Skinner and her cousin into custody when they – at Appellant's request – attempted to leave in his truck (Ct. R. vol. 4, at 286-87). After a long and intense standoff, Appellant finally surrendered to police and was taken into custody (Ct. R. vol. 4, at 196-200).

## SUMMARY OF THE ARGUMENT

Appellant raises five points of error on appeal. His first alleges that trial counsel provided constitutionally ineffective assistance by not investigating Appellant's history of mental health, by not mounting an insanity defense or challenge to Appellant's competency to stand trial, and by not presenting evidence of Appellant's mental health history in mitigation at punishment. This claim fails for several reasons: first, neither Appellant nor his mother disclosed any significant mental health issues or history of treatment to trial counsel. What Appellant did disclose did not reasonably raise concerns in counsel's mind, as Appellant appeared competent leading up to trial and his actions during and after the offenses indicated he was not insane. Moreover, the things Appellant disclosed could reasonably be considered prejudicial to Appellant as opposed to mitigating or helpful, so counsel reasonably chose not to present Appellant's mental health condition as a defense. Finally, even if counsel was objectively unreasonable in this evaluation of Appellant's mental health, it is not likely that any of the evidence presented post-trial would have changed the outcome of Appellant's trial for his

6

benefit. Because Appellant does not show that counsel representation was deficient, or that but for counsel's decisions the outcome of his trial would have been different, Appellant's first point of error should be overruled.

Appellant's second point argues that the trial court should have conducted an informal inquiry into Appellant' competency when counsel suggested Appellant might be mentally ill. However, the mere suggestion of mental illness does not, by itself, suggest incompetency, and the facts underlying counsel's suggestion did not reasonably indicate that Appellant either did not understand or could not communicate about the trial process. Moreover, Appellant has not produced anything suggesting that he is or was incompetent during trial, so his second point of error should likewise be overruled.

Appellant's third and fourth points allege that the trial court improperly allowed several portions of testimony to come before the jury that violated the evidentiary rules against hearsay. However, the topics of testimony that Appellant complains of either were not hearsay or reasonably fit within the exceptions to the rule. Additionally, a good bulk of testimony that Appellant now complains of came into evidence through the testimony of other witnesses as well, so any error in the trial court's rulings was harmless.

Appellant's final point of error claims that the evidence was legally insufficient to support a finding that Appellant burglarized the residence where the

offenses occurred because he was a part owner of that residence. This, however, ignores direct testimony that Appellant had relinquished his claim to live or occupy the residence during the pendency of his divorce, and that Appellant's wife was in possession of the residence via the agreement they had reached. Because the jury had direct evidence that, if believed, established Gina's sole right to occupy the house, there is legally sufficient evidence to support the jury's guilty verdict, and Appellant's final point of error should be overruled.

## ARGUMENT

1. **Counsel's decisions regarding Appellant's mental health history were not objectively unreasonable, and any additional investigation would not have led to mitigating evidence or a viable insanity defense.**

Appellant's first point of error alleges that his trial counsel provided ineffective assistance by not investigating Appellant's mental health history, by not mounting an insanity defense or a challenge to Appellant's competency to stand trial, and by not eliciting testimony about Appellant's mental health during the punishment phase of trial. A person is incompetent to stand trial if the person does not have sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding, or a rational as well as factual understanding of the proceedings against the person. TEX. CODE CRIM. PRO. Art. 46B.003(a). A person is presumed to be competent to stand trial unless proved otherwise by a preponderance of the evidence. *Id.* at (b).

8

A person is insane for purposes a criminal prosecution if, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that the conduct was wrong. TEX. PENAL CODE § 8.01(a). The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or antisocial conduct. *Id.* at § (b).

Texas courts apply the *Strickland* standard when considering a claim of ineffective assistance of counsel. *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011). That standard requires the applicant to show, by a preponderance of the evidence, that his attorney's performance was unreasonably deficient and that he was actually prejudiced by the deficiency. *Id.* at 900-01.

In assessing deficiency, the reviewing court asks whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The reviewing court must be highly deferential to counsel's performance, and must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. The court must look to the totality of the representation and base its decision on the facts of the particular case, with every effort being made to eliminate the distorting effects of hindsight. *Strickland*, 466 U.S. at 689-90. This is because "representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in

9

another." *Id.* at 693. Therefore, the mere fact that another attorney might have pursued a different strategy will not support a finding of ineffective assistance of counsel. *Id.* at 689. Rather, the record must affirmatively show that counsel's action was without any plausible basis. *Ex parte Ewing*, 570 S.W.2d 941, 945 (Tex. Crim. App. 1978).

In addition to showing that counsel's performance fell below an objective standard of reasonableness, an appellant must also prove that there is a reasonable probability that but for counsel's errors the result of the trial would have been different. *Strickland*, 466 U.S. at 694. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* at 693. Rather, the appellant must show that the decision reached would reasonably likely have been different absent counsel's error. *Id.* at 696. Though it is not a strict outcome-determinative test, "the difference [in standard]… should alter the merit of an ineffectiveness claim only in the rarest case." *Id.* at 697.

When assessing the reasonableness of counsel's investigation, a reviewing court must consider all the evidence known to counsel at the time and determine whether the known evidence would cause a reasonable attorney to investigate further. *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006). A particular decision not to investigate should be considered for its reasonableness under all the circumstances, applying significant deference to counsel's judgment.

10

*Id.* In order to prevail on a claim of ineffectiveness for failure to investigate, an appellant must also show that the additional investigation would likely have affected the outcome of the proceedings. *See Rodriguez v. State*, 329 S.W.3d 74, 82 (Tex. App. – Houston [14th Dist.] 2010, no pet.).

a. Appellant gave trial counsel no reason to investigate.

Counsel testified that it is his standard practice to ask clients about their prior mental health and psychological history, and that he did so in this case during one of his first meetings with Appellant (Ct. Supp. R. at 47).[2] Even so, there was very little evidence available to trial counsel that suggested Appellant was insane, incompetent, or suffering from any mental illness whose effects would mitigate his culpability. Counsel testified that he had been told by Appellant and Appellant's mother that Appellant had been hospitalized twice for a drug or alcohol overdose, and that he had made claims that he intended to commit suicide (Ct. Supp. R., at 15, 47). His notes reflect a conversation with Appellant's mother in which she told him that Appellant had been to "Green Oaks in Collin County" in 2012, which counsel understood to mean that Appellant had been briefly hospitalized and released from that institution (Defendant's Supp. Ex. 4; Ct. Supp. R., at 24-25).[3]

---

[2] There is no volume number affixed to the transcript of the hearing on Appellant's motion for new trial. It is simply referred to as the "supplemental record" and will herein be referenced as such.

[3] Exhibits admitted at the hearing on Appellant's motion for new trial will be distinguished as "Defendant's Supp. Ex."

11

The notes also contain the phrase, "always Green Oaks in the 90's," although the record does not reflect counsel's understanding of those words (Defendant's Supp. Ex. 4). Additionally, Appellant's mother wrote counsel a letter claiming that Appellant was suffering from "weeks of sleep deprivation and depression" on the night of the offenses (Defendant's Supp. Ex. 5). Throughout counsel's representation, both Appellant and his mother repeated themes of depression in various letters, documents, and conversations, and counsel testified that he was aware Appellant had reportedly been depressed and threatened suicide in the past (Ct. Supp. R., at 31). However, he testified that these were represented to be isolated events, and that they resulted from Appellant's abuse of drugs and alcohol as opposed to any mental illness (Ct. Supp. R., at 49).

These representations therefore had little effect on counsel's opinion of Appellant's mental state. Counsel, a registered nurse for 30 years, testified that depression is extremely common in criminal defendants and is not, in and of itself, a red flag for mental illness (Ct. Supp. R., at 44, 72). In his own words, counsel stated that "if I were to have everyone reviewed or have an expert appointed for everybody who said they were depressed, I'd probably be having one appointed for everybody in the jail because being in jail is depressive" (Ct. Supp. R., at 44). Thus, counsel did not consider whatever isolated bouts of depression Appellant may have had to be the type of "mental disease or defect" that would trigger

12

further investigation, much less that would be enough to mount an insanity defense (Ct. Supp. R., at 72).

Apart from general statements about depression and suicide, neither Appellant nor his mother had much information to offer trial counsel. Regarding the Green Oaks commitment in 2012, both told counsel that Appellant had been admitted and released within about two days, and counsel testified that he knew this meant Appellant did not pose a threat to himself or others (Ct. Supp. R., at 68). The commitment was not for mental illness, but instead came about because Appellant had threatened to commit suicide and ingested pills and alcohol (Ct. R. vol. 10, at 47-48; Ct. Supp. R., at 15, 48-49, 69-70). For her part, Appellant's mother was unclear about hospitalizations or treatments other than Green Oaks (Ct. Supp. R. at 77-78). She did not know when and where her son may have been hospitalized, other than to say he had been to Green Oaks in 2012 and to Parkland sometime in 1996 or 1997 (Ct. Supp. R., at 77-78, 88). She admitted she never mentioned the Parkland visit to trial counsel, and that all he knew about were the "McKinney hospitals" (Ct. Supp. R., at 89-90). In some cases she testified that she didn't know whether Appellant had been hospitalized at all (Ct. Supp. R., at 95). She admitted that her memory was imperfect and that the Appellant would be the only one who could give trial counsel a clear history of his mental health treatment, and she conceded that it would be unfair to blame trial counsel for not

13

investigating treatments that he was not made aware of (Ct. Supp. R., at 95). She also conceded that the Appellant did not want her discussing his mental health with trial counsel at all (Ct. Supp. R., at 101).

To that end, there is nothing in the record indicating that the Appellant ever told counsel of any other hospitalization or treatment for mental illness. There is nothing indicating Appellant was taking or had ever taken any anti-psychotic medication or other substance that might have alerted counsel to a significant mental impairment. There is nothing to suggest Appellant suffered from delusions, hallucinations, impaired thinking, schizophrenia, bizarre behavior, paranoia, or any other condition that would suggest a "severe mental disease or defect." In fact, nothing in the record suggests anything other than vague claims of depression and the occasional suicidal ideation, often coinciding with a divorce, arrest, loss of job, or other similarly stressful event. In short, if there were hospitalizations other than his brief Green Oaks stay, or if there was any other treatment that Appellant sought for mental illness or impairment, he did not make his counsel aware of it.

Trial counsel cannot be faulted for the intentional withholding of vital information by his client. *Rodriguez v. State*, 74 S.W.3d 563, 568 (Tex. App. – Amarillo 2002, pet. ref'd). A criminal defendant has a duty to disclose information pertinent to his defense, and should he withhold it, he may not complain about the effect his own evasive conduct had upon the performance of counsel. *Id.* at 569.

14

Because neither Appellant nor his mother told counsel of any condition that would reasonably alert him to the possibility of diminished capacity, incompetence, or insanity, trial counsel cannot objectively be said to have acted unreasonably in failing to seek out evidence of such condition. As such, Appellant's first point of error should be overruled.

      b. <u>Appellant appeared perfectly competent and his actions indicated that he knew what he did was wrong.</u>

In addition to having no reported history of mental illness, Appellant's behavior leading up to trial gave counsel no cause for alarm. Counsel testified that Appellant appeared competent and "he never appeared to be insane, and there was no evidence in the record other than his threat to commit suicide that would even show he had a mental illness" (Ct. Supp. R., at 35-36). Specifically with respect to Appellant's competency, counsel testified that he "had no reason to believe that [Appellant] was incompetent, that he didn't know who the court was, that he didn't know what my responsibility was, what the prosecutor was; and, in fact, he had filed his own motions, so he understood how the court needed to move" (Ct. Supp. R., at 37).

Indeed, the record reflects that Appellant filed numerous letters and motions on his own behalf that reflect an understanding of court concepts and procedure, and in some cases a desire to proceed *pro se* (Cl. R. at 36, 67, 77, 81-131, 139, 155). Appellant gave a lengthy interview to law enforcement in which he discussed

15

and was able to explain several aspects of the case (State's Ex. 5R). The State also introduced several recordings of telephone calls between Appellant and his mother in which they openly discuss the merits, procedure, and strategy of the case (State's Ex. 6R, 156). Finally, Appellant appeared before the trial court on more than one occasion and gave lucid, thoughtful testimony that reflected a clear perception of the issues in his case (Ct. R. vol. 2, at 5-19). Thus, Appellant demonstrated a rational as well as factual understanding of the charges against him, as well as a present ability to discuss his case with counsel (and the court) in preparing for trial.

With respect to his sanity, counsel testified that Appellant appeared to know he could be prosecuted for his actions and that the crimes alleged against him were, in fact, crimes (Ct. Supp. R., at 44-45). Moreover, counsel testified that Appellant seemed to understand that the acts he was alleged to have done were morally wrong (Ct. Supp. R., at 57-58). Neither Appellant nor his mother ever suggested to counsel that Appellant was sick or operating under the influence of some delusion (Ct. Supp. R., at 59). Rather, they portrayed his depression, lack of sleep, and possible drug use as justification for his actions (Ct. Supp. R., at 59). In counsel's opinion, this was not sufficient legal justification upon which to base a defense (Ct. Supp. R., at 40-41).

Additionally, Appellant took actions at the time of the offenses that showed

16

he was aware of the wrongness of his actions, the criminal nature of his conduct, and that he would be held responsible if caught. He fled the scene upon seeing police lights and told Gina that he would kill her because Donny had reported him to the police (Ct. R. vol. 3, at 110-11). He drove to Marsha Skinner's apartment in Grayson County and hid out while police hunted for him (State's Ex. 5R; Ct. R. vol. 4, at 280). He wouldn't tell her what was going on, and he tried once to sneak out of the apartment (Ct. R. vol. 4, at 280-81). He changed his clothes and borrowed a hat to conceal his identity, then asked if he could use her car even though his truck was right outside (Ct. R. vol. 4, at 281). However, he immediately retreated inside once he saw law enforcement approaching (Ct. R. vol. 4, at 281). He then asked her to take his truck, presumably so that it wouldn't be found in the parking lot, and he offered to pay her $100 to do so (Ct. R. vol. 4, at 282, 286-87). As he spoke to the negotiating officer by telephone, Appellant relayed certain details of the assault, including that he had received oral sex from the victim (Ct. R. vol. 4, at 197-98). Appellant finally surrendered himself after a four-hour standoff, but before he did, he hid the gun that he had used under his girlfriend's mattress (Ct. R. vol. 4, at 197, 290-93). Once arrested, he gave an interview to law enforcement in which he denied, minimized, or justified his own actions while shifting blame to his wife (State's Ex. 5R). All of these actions and statements indicate that Appellant understood his actions were illegal and wrong, and his trial

17

counsel was therefore justified in ruling out insanity as a viable defense.

Trial counsel is not ineffective for failing to present the insanity defense if the evidence shows that the defendant was aware his conduct was wrong at the time the offense was committed. *Taylor v. State*, 2010 Tex. App. LEXIS 5591 at *15-16 (Tex. App. – Texarkana 2010, no pet.), *see also Martinez*, 195 S.W.3d at 722.[4] Because the evidence available to counsel leading up to the time of trial showed that Appellant was neither incompetent nor insane, counsel was within the "wide range of reasonable professional assistance" in not pursuing those claims. *Strickland*, 466 U.S. at 689. Appellant's first point should therefore be overruled.

### c. Counsel's decision not to use Appellant's mental health as a defense or an attempt at mitigation was valid trial strategy.

In evaluating a claim of deficient performance, a court must not second-guess legitimate strategic or tactical decisions made by trial counsel, and instead must indulge a strong presumption that counsel's conduct was reasonable. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). This means that unless the record sufficiently demonstrates that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate "unless the challenged conduct was so

---

[4] *Martinez* deals with the mitigating effect of temporary insanity caused by voluntary intoxication in a capital case, but it reaches the same conclusion: that trial counsel is not ineffective for failing to present the [temporary] insanity defense if the evidence shows that the defendant was not insane. *Taylor* draws guidance from *Martinez* on this point.

18

outrageous that no competent attorney would have engaged in it." *Id.* at 696-97. Here, not only was counsel unconvinced of the viability of the insanity defense, but he also had valid reasons to avoid presenting Appellant's mental health history as an attempt at mitigation.

First, counsel testified that, for many of his years as a nurse, he worked with patients that had attempted or threatened suicide (Ct. Supp. R., at 19). In that experience, he observed a distinct stigma against suicide and those who attempt or threaten to commit it (Ct. Supp. R., at 40). Even among his fellow health care professionals, counsel observed a disdain and dislike for suicide patients, so much so that he volunteered to care for them so that they could receive the treatment they needed (Ct. Supp. R., at 50-51). Counsel testified that he thought this stigma might affect members of the jury, and that while it was possible the evidence could be mitigating, it was more likely that it would actually hurt his client (Ct. Supp. R., at 40, 49-50). Counsel was not willing to make that gamble.

The phenomenon of stigma is borne out in research. Those who commit it are often labeled as "selfish," or "crazy," or "having taken the easy way out." Kristina Cowan, *Suicide and its Unrelenting Stigma*, THE HUFFINGTON POST, January 26, 2015.[5] They are often portrayed in popular media as either frightening or funny or both. *Id.* They are frequently shunned by society, shamed, or treated as

---

[5] Found at http://www.huffingtonpost.com/kristina-cowan/suicide-and-its-unrelenti_b_6543364.html

though they are taboo.  Lisa Esposito, *Suicide and Stigma: Moving Past Silence and Shame*, U.S. NEWS AND WORLD REPORT, September 9, 2015.[6] Suicide and suicidal thoughts often evoke emotions of anxiety, shame, confusion, and sometimes even anger. *Id.* The very terminology – one "commits" suicide as one would commit a crime – is indicative of its low regard in society. *Id.* Indeed, under English common law, suicide was a felony, and within the lifetime of most modern jurors it remained a crime in most American states.  *See, e.g., Wackwitz v. Roy*, 418 S.E.2d 861, 864 (Va. 1992).  Although it is no longer criminalized in Texas, aiding or assisting another's commission of suicide may constitute a crime. *See* TEX. PENAL CODE § 22.08.

Moreover, as counsel noted in his testimony, many religiously-minded jurors might consider suicide or the attempt thereof "a damnable sin" (Ct. Supp. R., at 40, 51). Such perceptions have pervaded Christian thought for hundreds if not thousands of years.[7] These beliefs commonly persist in many faiths, especially in northeast Texas; as the trial court noted at the hearing on Appellant's motion for new trial, counsel had:

> …a very rational fear… of the highly conservative and religious
> population and jury pool that this case would be tried in front of.

---

[6] Found at http://health.usnews.com/health-news/patient-advice/articles/2015/09/09/suicide-and-stigma-moving-past-silence-and-shame?page=2

[7] For example, in Dante's *Inferno* those who committed suicide were condemned to the seventh ring of hell and were precluded from resurrection or entry into Heaven on the final day of reckoning.  DANTE ALIGHIERI, DANTE'S INFERNO: THE VISION OF HELL FROM THE DIVINE COMEDY 82-87 (First Avenue Editions 2015) (1321).

> There was a likelihood, a reasonable likelihood that the panel would consider Mr. Morrow's attempts to be … actually a damnable sin, and he did not want to – given the circumstances surrounding trial and the location, he did not want to have to combat those deeply held beliefs.

(Ct. Supp. R., at 130). Thus, counsel had a rational basis for withholding evidence of Appellant's suicidal attempts and ideations that was based in a reasonable understanding of his jury pool and the biases and beliefs they likely held.

Counsel had another tactical reason as well. Appellant was on trial for two charges of aggravated sexual assault, and law enforcement had collected samples of DNA from the victim's underwear that it matched to Appellant (Ct. R. vol. 5, at 265). The match was not conclusive, however, and counsel requested and received appointment of an expert to challenge the State's contention that the DNA found was, in fact, Appellant's (Ct. R. vol. 6, at 102). Much time was spent during trial developing evidence both for and against this contention, and in the end Appellant was acquitted of one of the aggravated sexual assault charges (Ct. R. vol. 8, at 15-16). This was one of the tactical victories counsel secured for his client.

A second came in the suppression of Appellant's statement to law enforcement. In his statement, taken shortly after his arrest, Appellant admitted to several things that corroborated the State's witnesses, including having oral and vaginal sex with the victim (State's Ex. 5R). Additionally, however, Appellant stated that he had threatened suicide on the night of the offenses but he never intended to follow through (State's Ex. 5R). Rather, his only purpose in making the

21

threat was to gauge his wife's love for him (State's Ex. 5R). Had Appellant attempted to mount an insanity defense with evidence of his past suicidal thoughts, the State would arguably be entitled to present his recorded statement in rebuttal, even though it had been excluded from the State's case-in-chief. *See Small v. State*, 466 S.W.2d 281, 283 (Tex. Crim. App. 1971). If admitted, this evidence would completely undermine all of counsel's efforts in challenging the State's DNA evidence, and it would also tend to negate any mitigating effect Appellant might have engendered in the jury with evidence of his mental health history, as well as any potential claims of insanity or incompetence based on prior threats of suicide.

Moreover, such brazenly deceitful and manipulative behavior would not only impeach the credibility of Appellant's case, but it would also show Appellant in a very poor light vis-à-vis the victim in the case. Counsel's tactical decision to limit Appellant's exposure to this light, as well as to avoid further corroboration of the State's case, does not fall below an objective standard of reasonableness, especially given the relatively weak mitigating character of the evidence in the first place. Appellant's first point should therefore be overruled.

    d. <u>Even if counsel should have investigated further, the record evidence is not mitigating and does not support a claim of incompetence or insanity.</u>

In addition to showing that his trial counsel's performance was deficient, an ineffective assistance claim requires the Appellant to show that he was prejudiced

22

by that performance. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). That is, he must show there is a reasonable probability that but for the deficient performance the outcome of the trial would likely have been different. *Id.* When the deficiency alleged involves a failure to investigate, prejudice is only shown by demonstrating that further investigation would have led to evidence that would have supported a viable defense or otherwise changed the outcome of the trial. *Ex Parte Imoudu*, 284 S.W.3d 866, 870-71 (Tex. Crim. App. 2009); *Hill v. Lockhart*, 474 U.S. 52, 60 (1985).

As discussed *supra*, the evidence of Appellant's mental health history is not especially mitigating of his guilt. The evidence presented at the hearing on Appellant's motion for new trial also does not support a claim of incompetence or insanity. It consisted primarily of medical records from three different institutions: Parkland Hospital in Dallas, Medical Center of McKinney, and the Fannin County jail. The Parkland records, introduced as Defendant's Supplemental Exhibit 1, showed that Appellant visited that hospital on August 7, 1996, at approximately 9:40 p.m., inquiring as to whether he had a "chemical imbalance" (Defendant's Supp. Ex. 1). He complained of having "highs" and "lows," decreased sleep, decreased appetite, weight loss, and generalized worry and anhedonia (Defendant's Supp. Ex. 1). He reported no previous psychological or family history, and he appeared well-groomed, alert, oriented, and with good insight and judgment

23

(Defendant's Supp. Ex. 1). He reported having some chronic depression in the past, as well as occasional thoughts of suicide, but denied any present suicidal ideations (Defendant's Supp. Ex. 1). He presented as having some signs of depression but, importantly, he reported several significant stressors in his life as well (Defendant's Supp. Ex. 1). He reported recently separating from his wife and two children, undergoing a job change, and quitting drinking (Defendant's Supp. Ex. 1). According to him, he separated from his wife because of his anger and "extreme temper," and he reported pushing her once but never striking her (Defendant's Supp. Ex. 1). He was discharged at 1:25 a.m., less than four hours after arriving (Defendant's Supp. Ex. 1).

There is nothing in Defendant's Exhibit 1 that indicates Appellant was suffering from any mental disease or defect at the time of his visit to Parkland. There is nothing indicating that he was suffering from any delusions or irregular thinking, or that he didn't know or understand who he was or what he was doing. That Appellant would demonstrate signs of depression shortly after a separation from his wife and two children is not abnormal, especially when coupled with other stressors such as changing jobs or quitting drinking. More importantly, however, is what the Parkland records do show: someone whose anger, violence, and "extreme temper" caused the dissolution of his marriage. Far from being mitigating of Appellant's violent conduct, they reinforce the image of Appellant as

24

exactly what the State portrayed.

Defendant's Supplemental Exhibit 2 is the records from Medical Center of McKinney. In relevant part, these reflect essentially the same information that Appellant and his mother gave to trial counsel: that he was admitted in October, 2012, for a drug overdose, intoxication, and possible suicide attempt (Defendant's Supp. Ex. 2). He had apparently taken Valium and another medication and consumed a considerable amount of alcohol (Defendant's Supp. Ex. 2). He was brought to the hospital by ambulance after texting a friend an apparent statement of suicidal intent, but once admitted he adamantly denied wanting to hurt himself (Defendant's Supp. Ex. 2). Rather, Appellant stated that he was under considerable stress because of a recent separation from his wife, and that he took the medication and alcohol in order to go to sleep (Defendant's Supp. Ex. 2). He stated that he had recently felt "down, depressed, or hopeless," and that he had noticed less interest or pleasure in doing things – not abnormal given the life stressors he was dealing with – but he denied thoughts of hurting or killing himself or others (Defendant's Supp. Ex. 2). He also stated that he had, in fact, never attempted to hurt himself prior to that day (Defendant's Supp. Ex. 2). Nevertheless, hospital staff apparently felt compelled to transfer him to the psychiatric center for further observation (Defendant's Supp. Ex. 2). He was discharged the next day with little more than a counseling referral (Defendant's Supp. Ex. 2).

25

Much like the Parkland records, these records do not appear to be particularly helpful to Appellant, and may in fact have been harmful. They do not indicate that Appellant was suffering from any delusions, hallucinations, or mental disease. They do not indicate that he was confused about himself or his location. They do state that he is a "longstanding alcoholic" and that he was heavily intoxicated at the time, but they otherwise present no picture of any errant thinking or mental impairment. In fact, all of the notations indicate that Appellant was alert, oriented, and fully in command of his mental faculties. Although there is an apparent diagnosis of "major depressive disorder," that diagnosis only appears once in all of the records, and is made only as part of a physician's affidavit to support an involuntary commitment. The commitment itself appears to have been merely a precaution, as Appellant was discharged the following day. Much like the Parkland records, these records merely seem to show that Appellant was depressed because his wife left him.

But there is also some harmful material in the records. Appellant was highly intoxicated and admitted to drinking heavily. He was hostile and threatening to the staff, yelling profanities and demanding to be released. Much like the night of the offenses, Appellant threatened a suicide that he did not actually intend to follow through on. In fact, Appellant afterward went to great lengths to minimize his risk of suicide, and was adamant that he would never harm himself because he "has too

26

much to live for." This undermines any proposed insanity defense based on past depression or suicidal ideation.

More importantly, the only person Appellant asked the hospital to contact upon his discharge was his wife, the same person to whom he would later threaten suicide as a means of gauging her affection for him. This would seem to suggest that Appellant was using a staged suicide as an attempt to reconnect with his wife, much like he tried to do on the night of the offenses. In this light, it is unlikely that a jury would consider this evidence mitigating and more likely that it would take it as further proof of Appellant's manipulative and deceitful nature.

Defendant's Supplemental Exhibit 3, medical records from the Fannin County jail, are of similarly questionable utility to Appellant. When Appellant was initially booked, on May 5, 2013, he denied any previous suicide attempts (Defendant's Supp. Ex. 3). In September of that year, he was counseled because of his comments that he was going to hang himself, but advised the doctors that he was merely joking (Defendant's Supp. Ex. 3). Appellant's mental health appraisals all indicate clear, rational thought – albeit with some depressive tendencies – and no hallucinations, bizarre behavior, or other signs of mental illness (Defendant's Supp. Ex. 3). Importantly, they also indicate that Appellant had no history of psychiatric hospitalization, further leading to the conclusion that if such hospitalizations occurred, Appellant did not disclose them (Defendant's

27

Supp. Ex. 3). Only after his trial, on March 30, 2015, did Appellant report prior suicide attempts: one by overdose in 2012 and another by knife in 1999 (Defendant's Supp. Ex. 3).[8]

All told, the evidence pertaining to Appellant's mental health and treatment is not such as would likely change the outcome of the trial had it been introduced. While the records do tend to reflect some depressive symptoms, those symptoms seem to be an emotionally appropriate response to certain stressors in the Appellant's life at the time they were reported. There is no evidence that Appellant suffered from any mental disease or defect, nothing indicating that he did not understand the wrongfulness of his acts, and nothing suggesting that he was incompetent at trial or at any other time. In fact, the records reflect someone with clear thought, understanding, and insight into his actions. Moreover, the records contain evidence of Appellant's alcoholism, violence, domestic abuse, drug overdose, manipulation, and deception. Far from being helpful or mitigating of Appellant's guilt, these records would likely have been harmful to Appellant's case if introduced into evidence. Because Appellant has not carried his burden of proving prejudice from his trial counsel's failure to investigate a mental health defense, his ineffectiveness claim falls short. As such, even if counsel was

---

[8] There is nothing in the record about the latter attempt, except possibly the testimony of Appellant's mother, who testified about an event in 1996 in which Appellant cut himself (Ct. Supp. R., at 79). However, she indicated that he received treatment in McKinney, and no documentation exists for such an injury in the records of that facility (Ct. Supp. R., at 91).

28

objectively unreasonable in not investigating, Appellant's first point of error should be overruled.

### 2. A trial court is not required to inquire into competency when there is no evidence that a defendant is incompetent.

A trial court's decision to hold an informal competency inquiry is reviewed for an abuse of discretion. *Jackson v. State*, 391 S.W.3d 139, 141 (Tex. App. – Texarkana 2012, no pet.). The appellate court must not substitute its own judgment for that of the trial court, but must merely consider whether the trial court's decision was arbitrary or unreasonable. *Id.*

A suggestion of incompetency requires the trial court to conduct an informal inquiry to determine if there is evidence from any source that may indicate a defendant is incompetent to stand trial. TEX. CODE CRIM. P. art. 46B.004(c); *Turner v. State*, 422 S.W.3d 676, 691 (Tex. Crim. App. 2013). A "suggestion" of incompetency is a threshold requirement that may consist solely of a representation from any credible source that the defendant may be incompetent. TEX. CODE CRIM. P. art. 46B.004(c-1). Although a court is not required to have a bona fide doubt as to a defendant's competency before inquiring further, it appears the suggestion itself must have some evidentiary basis. *See id.*at (b); *see also Jackson*, 391 S.W.3d at 141.[9] Mere statements that a defendant is unwilling to cooperate with

---

[9] Both the Code of Criminal Procedure and citing case law indicate that an informal inquiry is required only when "evidence suggesting the defendant may be incompetent to stand trial comes

his attorney, or that he disagrees with his attorney about trial strategy, are not sufficient to support a suggestion of incompetency. *See, e.g., Turner*, 422 S.W.3d at 690-91. Nor is it sufficient merely to state that a defendant might be mentally ill, as mental illness does not by itself indicate incompetency. *Id.* at 691. Rather, the evidence must raise the possibility that the defendant cannot understand the proceedings against him or engage rationally with counsel in the pursuit of his own best interests. *Id.* Only then is the trial court required to conduct an informal inquiry. *See id.*; *see also Govea v. State*, 2013 Tex. App. LEXIS 15136 at *6-7 (Tex. App. – San Antonio 2013, no pet.).

In *Govea*, the defendant, just before sentencing and in response to the court's question as to any reason sentence should not be imposed said, "I don't really know. I can't really concentrate right now because I've been on drugs… a while so I don't know what's going on." *Id.* at *2. The trial court did not conduct any further inquiry into Govea's competency before proceeding with the plea. On review, the appellate court found that Govea's statements did not suggest he was unable to consult with counsel or that he lacked a rational understanding of the proceedings. *Id.* at *4-5. The court noted that he had clearly entered his plea of "not guilty," that he had been able to consult with counsel, that he appeared to

before the court." The evidence may come in the form of affidavit, TEX. CODE CRIM. PRO. art. 46B.004(a), or from some other source, but a trial court must find, as an initial step, that there is in fact some evidence of incompetency before it is required to proceed with an informal inquiry. *See, e.g., Druery v. State*, 412 S.W.3d 523, 538 (Tex. Crim. App. 2013).

30

understand the events as they unfolded at trial, and that there was no evidence suggesting otherwise. *Id.* As such, the court found no abuse of discretion in failing to conduct an informal inquiry into Govea's competency. *Id.* at *6-7.

Likewise, in this case there was no evidence that Appellant was unable to understand the proceedings against him, and in fact there was evidence that he understood them well and that he took an active role in his defense. He communicated frequently with his counsel and was able to tell him what he wanted done in his case, who he wanted subpoenaed, what defenses he thought could be raised, and whether he wanted to testify on his own behalf. The trial court made these observations on the record, and could rely on said observations in making its determination to hold an informal inquiry (Ct. R. vol. 2, at 6).

Moreover, as in *Govea*, counsel's statement did not rise to the level of suggesting incompetency. He never said that Appellant was unable to understand the proceedings against him or that he was unable to rationally discuss his options in defense. He never used the word "incompetent" or any variation thereof. He simply stated that "the [Appellant] may very well be mentally ill" (Ct. R. vol. 9, at 152). The only basis counsel gave for this statement was that (a) the Appellant apparently disregarded the court's admonishment not to discuss the case with other witnesses, and (b) that the Appellant relied not on sound trial strategy or tactics, but on his belief in the will of God to deliver him from a conviction (Ct. R. vol. 9,

31

at 152-53). This is simply not incompetency. The mere fact that a criminal defendant, even one who might be mentally ill, refuses to cooperate with his trial counsel does not mean he is incompetent. *Turner*, 422 S.W.3d at 691. And, as the trial court noted, the mere fact that someone chooses to disregard a court's instruction likewise does not make them incompetent (Ct. R. vol. 9, at 153). Because trial counsel never referred the trial court to evidence suggesting that Appellant was incompetent, no further inquiry was necessary, and Appellant's second point of error should be overruled.

Even if Appellant's point is correct, he still has failed to meet even the low burden required for appellate relief: that is, setting aside any evidence of competency, he has not produced more than a scintilla of evidence that would support a rational finding that he was incompetent. *Turner*, 422 S.W.3d at 696. He has not produced any evidence – from himself, his mother, or his trial counsel – suggesting that he was unable to understand the proceedings against him or that he could not rationally and meaningfully communicate with his attorney. In fact, the record indicates that Appellant was an active participant in his trial defense and that he communicated with his counsel quite well (albeit with disagreements), and trial counsel testified that Appellant was, in his opinion and experience, competent. Because Appellant has not shown that he was incompetent, or that his counsel made any statement that suggested incompetency, he is not entitled to relief and his

32

second point of error should be overruled.

Finally, even if Appellant is entitled to relief on this point, he is not entitled to the relief requested. Rather, Appellant is entitled only to have his appeal abated and the case remanded to the trial court for determination of the feasibility of a retroactive competency exam. *Turner*, 422 S.W.3d at 696-97. As such, the State respectfully requests abatement, in lieu of a new trial, should this Court sustain Appellant's point of error.

## 3. Gina Morrow and Donny Mangum made statements admissible as excited utterances soon after being violently assaulted, threatened, and raped by Appellant at gunpoint.

Appellant third point of error complains of the admission of several statements over hearsay objections. He characterizes these statements as being illustrative of "background," despite also acknowledging that the record does not support this conclusion. In truth, each of the statements was admitted as an excited utterance, and therefore excepted from the rules against hearsay. *See* TEX. R. EVID. 803(2).

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). A trial court abuses its discretion when it acts arbitrarily and unreasonably, or without any reference to guiding rules and principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court's decision to admit evidence will be

upheld so long as it is within the "zone of reasonable disagreement. *Id.* at 390-91.

Although hearsay is generally not admissible, an exception applies to statements relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition. TEX. R. EVID. 803(2). The rationale for admitting such "excited utterances" is that the grip of emotion, excitement, or pain following an event causes one to lose the capacity for the type of reflection that would be necessary to fabricate a falsehood. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

In order for the exception to apply, the person making the statement must still be under the influence of the emotion or excitement of the traumatic event when the statement is made. *Apolinar v. State*, 155 S.W.3d 184, 186-87 (Tex. Crim. App. 2005). The trial court may consider the length of time between the event and the statement, the nature of the declarant, whether the statements are spontaneous or made in response to a question, and whether the statement is self-serving. *Id.* at 187. The key inquiry is whether the statement was made under circumstances that reasonably show it resulted from impulse rather than calculated reason or reflection. *Zuliani*, 97 S.W.3d at 596.

In this case, Appellant brazenly invaded the home of his ex-wife, Gina, and held her, her daughter, Marissa, and her boyfriend, Donny, at gunpoint for several minutes. He repeatedly threatened to kill them and the small children that were

34

asleep in the living room (Ct. R. vol. 3, at 70). He physically assaulted Donny and sexually humiliated him by demanding – at gunpoint – to see his penis (Ct. R. vol. 3, at 82).

After Donny managed to escape, he fled through the night, barefoot and barely dressed, across a field and through a barbed-wire fence, until he was able to reach the neighbor's residence (Ct. R. vol. 3, at 251). That person, unaware of the situation and assuming Donny was a burglar, also held him at gunpoint and threatened to shoot him, so Donny fled to the next available house (Ct. R. vol. 3, at 252-53). The owner of that residence also threatened him and released his dogs, and Donny was forced to cower and hide in the cold brush until police arrived (Ct. R. vol. 3, at 253). Meanwhile, Appellant sexually assaulted Gina in the cab of her pickup truck – in full view of Marissa – and forced her to perform oral sex at gunpoint (Ct. R. vol. 3, at 108-12). The statements Appellant now complains of were made in the direct aftermath of these traumatic events.

Appellant first complains of Donny's statement to law enforcement when they arrived at the neighbor's house. The responding officer testified that Donny was "frightened and scared" because Appellant had broken into the house and threatened to kill him with a gun (Ct. R. vol. 4, at 13, 15). At the time, Donny had no shirt – only shorts – and he had bloody abrasions all over his body, legs, and torso (Ct. R. vol. 3, at 251; vol. 4, at 13). Donny's statement merely relayed to

35

officers what had happened to cause his emotional state and injuries; only minutes had passed since the assault, and he was clearly still under the effect of the fear and trauma that Appellant caused. Under these circumstances, the trial court did not abuse its discretion in allowing the officer to testify about Donny's excited utterance.

The trial court likewise did not abuse its discretion in allowing testimony about Gina's statements to law enforcement once officers responded to her home. Officers took approximately 15 minutes to respond, and when they first arrived, Gina was visibly shaken (Ct. R. vol. 4, at 17-18). She was "crying and upset and appeared frightened… over what had happened" (Ct. R. vol. 4, at 17). While in this state, she described what Appellant had just done to her and to her family. As she spoke, Appellant continued to call her cell phone and speak to her. He did this several times over the next hour or so, threatening and attempting to manipulate Gina into not reporting his actions and into reconciling their marriage (Ct. R. vol. 3, at 119-23). These calls interrupted the officers' ability to speak with Gina because as each call came in, her emotional state escalated (Ct. R. vol. 4, at 27). Thus, she was continuously under heightened emotions for several minutes after Appellant fled and as officers attempted to speak with her.

For his part, Appellant's trial counsel did an admirable job of attempting to exclude this testimony. He objected several times to the State's questioning, and as

36

a result the trial court was very clear about the type of predicate it expected. Specifically, the court admonished the prosecutor to frame his questions not only in terms of the victim's emotional state, but also the cause of that state, the identity of the caller, and the time frame within which the statements were made (Ct. R. vol. 4, at 23, 29). The State, in turn, made it very clear to the testifying officer which statements were being sought and which would be admitted:

> So, you understand, Deputy, what we're interested in is statements that she made to you while she was still under some emotional duress, still clearly affected by the events that had happened to her. So, if we're talking about questions that happened at some point where she's managed to collect herself and calm down and give a rational statement, maybe we're not looking at that. We're looking at the – you understand – the emotionally-charged statements that are given.

(Ct. R. vol. 4, at 22-23). Given the officer's assent to understanding of this instruction, as well as the objections made by Appellant's counsel, the admonitions of the trial court, and the careful phrasing of questions by the State, the trial court was well within its discretion to find the statements testified to were made while Gina was still affected by the stress and emotion of Appellant's recent attack. The court therefore did not abuse its discretion in allowing the statements, and Appellant's third point of error should be overruled.

Even if the statements shouldn't have been admitted, their admission was harmless. The erroneous admission of hearsay is non-constitutional error subject to harm analysis under Texas Rule of Appellate Procedure 44.2(b). *Rivera-Reyes v.*

37

*State*, 252 S.W.3d 781, 786 (Tex. App. – Houston [14th Dist.] 2008). A reviewing court must disregard non-constitutional error unless it affects an appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Error affects a substantial right when it has a substantial and injurious effect or influence in determining the verdict. *Id.* Such error is harmless if, after examining the record as a whole, the reviewing court is reasonably assured the error did not influence the verdict or had only slight effect. *See Johnson v. State*, 967 S.W.2d 416, 417 (Tex. Crim. App. 1998). Error in admitting evidence is harmless if the evidence is cumulative of other evidence in the record. *Davis v. State*, 203 S.W.3d 845, 849-50 (Tex. Crim. App. 2006). Here, the statements testified to by law enforcement were also substantially testified to by Gina and Donny. Because the same evidence came before the jury by their direct testimony, any error in admitting the cumulative statements through law enforcement was harmless. As such, Appellant's third point should be overruled.

### 4. Hearsay, hearsay everywhere, none of it improper.

Appellant's fourth point multifariously complains of various portions of unrelated testimony, all of which he claims were inadmissible hearsay. Addressing each in turn:

a. Appellant did not object to testimony about his adulterous conversations with another woman, and even if he had, it was still admissible.

At the punishment phase of trial, Gina testified to an event in which the Appellant physically assaulted her daughter by knocking her to the ground and choking her in a headlock (Ct. R. vol. 9, at 10). She testified that Appellant, who was considerably bigger than both women, squeezed so hard that Marissa's face changed color, and that Gina had to actually wrestle her away from Appellant and stand in between them (Ct. R. vol. 9, at 10). Once Marissa was free, Gina took her out of the house and drove her safely to McKinney (Ct. R. vol. 9, at 10). In the confusion of the struggle and its immediate aftermath, Gina inadvertently grabbed Appellant's cell phone thinking it was hers (Ct. R. vol. 9, at 11). She testified that when she looked at his phone, she discovered texts and emails between the Appellant and another woman with whom Appellant had been having an affair (Ct. R. vol. 9, at 11-12). Appellant never objected when Gina testified to the substance of those communications.

That's not to say he didn't object at all. In developing the testimony, the prosecutor asked Gina whether she saw any communications between Appellant and anyone else on his phone (Ct. R. vol. 9, at 11). Appellant objected that the question called for hearsay and that objection was properly overruled,[10] as the

---

[10] (Ct. R. vol. 9, at 11)

39

question asked <u>whether</u> any conversations existed and not <u>what</u> the statements actually were. *See* TEX. R. EVID. 801(d).[11] Because no statement was offered into evidence, there was no hearsay. *Green v. State*, 1988 Tex. App. LEXIS 3086 at *6 (Tex. App. – Houston [1st Dist.] 1988).

Of course, Gina then went on to describe the content of Appellant's conversations with his mistress, but Appellant never objected to those statements. Thus, there is nothing presented for review. TEX. R. APP. P. 33.1; *Everitt v. State*, 407 S.W.3d 259, 262-63 (Tex. Crim. App. 2013). Even if Appellant had objected, the trial court could have properly allowed the testimony because the statements were, at least in part, those of the Appellant. Statements by a party are admissible as admissions of a party-opponent. TEX. R. EVID. 801(e)(2)(A). Moreover, the statements of the mistress would also have been admissible to the extent they provided context to the conversation. *See* TEX. R. EVID. 801(d)(2); *see also Acosta v. State*, 2015 Tex. App. LEXIS 10463 at *11-12 (Tex. App. – Ft. Worth 2015, no pet.). Because counsel did not object to the actual substance of Appellant's conversation with his mistress, and because those objections would have been properly overruled anyway, the first sub-part of Appellant's fourth point of error should be overruled.

---

[11] "Hearsay" means a <u>statement</u> that the declarant does not make while testifying at the current trial or hearing, and a party offers in evidence to prove the truth of the matter asserted in the <u>statement</u>. (emphasis added).

b.  <u>Some things simply aren't hearsay.</u>

Appellant's second sub-part complains about a conversation between Appellant's first wife, Susan, and the victim in this case, Gina.[12]  He complains that the State elicited testimony about Appellant's "status in the marriage, his fidelity…." While this is true, it isn't hearsay.  The prosecutor's question asked the witness whether she had ever had that conversation with Gina, not the substance of the conversation or the statements made therein, and the trial court specifically instructed the witness that she could answer only whether or not such a conversation took place (Ct. R. vol. 9, at 124). Because no out-of-court statement was offered, there was no hearsay.

Appellant also complains about testimony that Jenene discovered Appellant's profile on a dating website and showed it to Gina while Gina and Appellant were still married. Again, there was no statement offered and thus no hearsay. Appellant's mere presence on a website, without more, is not the sort of non-verbal conduct that could reasonably be considered a statement, especially when there is no evidence that Appellant intended it to be so. *See* TEX. R. EVID. 801(a). Even if it was, any "statement" made by Appellant would be admissible against him as a party-opponent. TEX. R. EVID. 801(e)(2)(A). Because no statement

---

[12] Appellant is mistaken as to the parties involved.  The record reflects the conversation was actually between Gina and Jenene McMillan, a former girlfriend of Appellant's with whom he shares a child (Ct. R. vol. 9, at 104-05).

41

was offered and no hearsay admitted, there was no error in allowing this testimony, Appellant's second sub-part should therefore be overruled.

c. <u>One has to object to hearsay in order to preserve error.</u>

Appellant's third sub-part complains about the testimony of yet another ex-wife, who testified that Appellant's mental abuse of her children once caused them to run away from home (Ct. R. vol. 9, at 191-93). The witness, Claudia, testified about an occasion during her marriage to Appellant when her children went to school and never returned (Ct. R. vol. 9, at 191). When they were eventually located at her sister's house, Claudia's son was "very emotional," and she testified – without objection – that he said he "couldn't take living with [Appellant] anymore" (Ct. R. vol. 9, at 192). She stated that at the time he made these statements he was still under the emotional stress of the events that caused him to run away, and – again, without objection – that he told her that Appellant was very mentally abusive when she was not around (Ct. R. vol. 9, at 193).

Appellant's complaint presents nothing for review because it wasn't preserved by a timely and specific objection. The one objection he did make was effectively sustained in that the court admonished the State to lay additional predicate (Ct. R. vol. 9, at 192). But Appellant didn't object to the remaining statements at the time they were made, and so he is precluded from complaining about them on appeal.

Even if Appellant had objected, the trial court could reasonably have admitted the statements as excited utterances; Claudia testified that her son was "very emotional" as a result of Appellant's abuse, and that the abuse is what caused her children to run away from home. While it may be possible to imagine a scenario where the child fabricated a claim of abuse, it is an equally reasonable conclusion that the child, at the time he made his statement, was legitimately under the effect of a very stressful emotional event. At the very least, the decision to admit the statement based on the predicate that was laid would have been within the "zone of reasonable disagreement" that a trial court is to be afforded. As such, Appellant has failed to show error, and his third sub-point should be overruled.

5. **The evidence is sufficient to show that Appellant did not possess, and did not have a greater right to possess the house that he burglarized.**

Appellant's final point of error complains that the evidence is legally insufficient to prove that Gina Morrow was the legitimate "owner" of the house that Appellant broke into. Appellant's argument effectively boils down to the contention that one cannot burglarize his own residence, a contention has been considered and rejected by other Texas courts. *See, e.g., Dominguez v. State*, 355 S.W.3d 918, 922 (Tex. App. – Ft. Worth 2011, pet. ref'd), *see also Mack v. State*, 928 S.W.2d 219, 223 (Tex. App. – Austin 1996, pet. ref'd).

When weighing the legal sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict and determines

43

whether any jury would be rationally justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Viewing the evidence "in the light most favorable to the verdict" means that the reviewing court is required to defer to the jury's credibility and weight determinations. *Id.* This is because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* (emphasis in original). An appellate court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and it must defer to that resolution. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). The question is not whether the appellate court itself believes the defendant is guilty beyond a reasonable doubt, but whether viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (emphasis in original).

A person commits the offense of burglary if, without the consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or assault. TEX. PENAL CODE § 30.02(a)(3). The Penal Code defines "owner" as one who has (a) title to the property, (b) possession of the property, whether lawful or not, or (c) a greater right to possession of the property than the actor. *Id.* at § 1.07(35)(A).

Appellant concedes that on the night of the offenses, Gina Morrow had possession of the residence and that both the residence and the gate were locked (Appellant's br. at 27). He concedes that Appellant had to gain entry to the house via a window (Appellant's br. at 27). He also concedes that he had moved out of the residence pursuant to an agreement with Gina while their divorce was pending (Appellant's br. at 6-7). Gina testified that she and the Appellant agreed he would move out of the residence in March of 2013, and that Appellant actually did move out on March 16 and she moved in shortly thereafter (Ct. R. vol. 3, at 56-57). She testified that under their agreement, Gina would remain in the home until the divorce was final (Ct. R. vol. 3, at 57-58). She further testified that on the night of the offenses, she was sleeping in the house with her boyfriend, her daughter, and her best friend's children (Ct. R. vol. 3, at 64-65). She went to bed at approximately 1:30 a.m. after making sure that every door and window in the house was locked, and she was awakened about an hour later by the Appellant (Ct. R. vol. 3, at 67). He was standing at the foot of her bed, pointing a gun at her, and demanding to know what she was doing (Ct. R. vol. 3, at 68). The evidence showed that although all doors had been locked prior to her going to bed, she discovered after the assault that the door to the garage was unlocked and open, and a window in the garage had been broken (Ct. R. vol. 3, at 117, 161-62). In short, Gina testified that she had sole possession of the residence on the night of the

45

break-in, and that she had obtained that possession by virtue of an agreement with Appellant.

This, in and of itself, is legally sufficient evidence to support a finding that Gina was the "owner" of the property as alleged in the indictment. Direct evidence of a fact is always legally sufficient to prove that fact. *Goodman v. State*, 66 S.W.3d 283 (Tex. Crim. App. 2000). Appellant essentially asks this court to revisit the jury's decision as to the weight and credibility of the evidence, and to resolve any perceived inconsistencies in the testimony *de novo*, but this is not an appellate court's role. Rather, the appellate court must defer to the jury's verdict, and only disturb a conviction if no rational juror could have found guilt beyond a reasonable doubt. Because there is direct testimony that, if believed, establishes Gina as the owner of the house, the jury's verdict as to that fact is supported by legally sufficient evidence, and Appellant's point of error should be overruled.

## CONCLUSION

Neither Appellant nor his mother disclosed any significant mental health issues or history of treatment to trial counsel, and what was disclosed did not reasonably raise concerns in counsel's mind, especially given Appellant's apparent competency leading up to trial and his evident sanity during and after the commission of the offenses. Moreover, the things Appellant disclosed could reasonably be considered prejudicial to Appellant as opposed to mitigating or

46

helpful, so counsel reasonably chose not to present Appellant's mental health condition as a defense. Finally, even if counsel was objectively unreasonable in this evaluation of Appellant's mental health, it is not likely that any of the evidence presented post-trial would have changed the outcome of Appellant's trial for his benefit. Because Appellant does not show that counsel representation was deficient, or that but for counsel's decisions the outcome of his trial would have been different, Appellant's first point of error should be overruled.

Because counsel never actually suggested incompetency, and because the facts underlying counsel's comments did not reasonably indicate that Appellant either could not understand or could not communicate about the trial process, the trial court was not required to conduct an informal inquiry into Appellant's competency during the punishment phase of trial. Moreover, because Appellant has not produced anything suggesting that he actually is or was incompetent during trial, his second point of error should be overruled.

Because the testimony Appellant complains of was either not hearsay or reasonably fit within the exceptions to the rule, the trial court did not abuse its discretion in allowing it before the jury. Additionally, because the testimony also came into evidence through the testimony of other witnesses, any error in the trial court's rulings was harmless.

Finally, because the jury had direct testimony that Appellant had

relinquished his claim to live or occupy the residence during the pendency of his divorce, and that Appellant's wife was in possession of the residence via the agreement they had reached, it could reasonably find that Gina held the right to occupy the house vis-à-vis the Appellant. There is therefore legally sufficient evidence to support the jury's guilty verdict for burglary, and Appellant's final point of error should be overruled.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, there being no reversible error in the trials of these cases, the State respectfully moves this Court to overrule Appellant's points of error and affirm his convictions. The State further prays for any and all such additional relief as the Court may deem just and appropriate.

Dated: <u>December 21, 2015</u>

Respectfully submitted,


/s/ *John B. Setterberg*
John B. Setterberg
State Bar No. 24043915
Assistant Criminal District Attorney
Fannin County, Texas
101 East Sam Rayburn Dr., Suite 301
Bonham, Texas 75418
903-583-7448
903-583-7682 (fax)

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing document contains 11,906 words, exclusive of the portions described by TEX. R. APP. P. 9.4 (i)(1), as computed by the computer program used to prepare the document.

/s/     *John B. Setterberg*
John B. Setterberg
Assistant Criminal District Attorney
Fannin County, Texas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served electronically to the individual listed below on this the 21st day of December, 2015.

/s/     *John B. Setterberg*
John B. Setterberg
Assistant Criminal District Attorney
Fannin County, Texas

Micah Belden
711 N. Travis
Sherman, Texas 75090
ATTORNEY FOR APPELLANT